Volume 1 of 2

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellant,*

v.

RAYMOND P. NOVAK,
            *Defendant-Appellee.*

No. 04-55838

D.C. No.
CV-03-06706-CBM

OPINION

Appeal from the United States District Court
for the Central District of California
Consuelo B. Marshall, Chief District Judge, Presiding

Argued and Submitted
October 3, 2006—San Francisco, California

Filed February 22, 2007

Before: Mary M. Schroeder, Chief Circuit Judge,
Harry Pregerson, Stephen Reinhardt, Andrew J. Kleinfeld,
Michael Daly Hawkins, Sidney R. Thomas,
Barry G. Silverman, M. Margaret McKeown,
Kim McLane Wardlaw, William A. Fletcher,
Richard A. Paez, Marsha S. Berzon, Johnnie B. Rawlinson,
Richard R. Clifton, and Jay S. Bybee, Circuit Judges.

Opinion by Judge Berzon;
Dissent by Judge W. Fletcher

**COUNSEL**

Brent A. Whittlesey, Assistant United States Attorney, Los Angeles, California, for the plaintiff-appellant.

Martin S. Bakst, Encino, California, for the defendant-appellee.

**OPINION**

BERZON, Circuit Judge:

We are asked to determine whether — and if so, under what circumstances — a criminal defendant's retirement benefits are available as a source of funds to compensate crime victims. Answering these questions requires reconciling two federal statutory schemes — one, the Mandatory Victims Res-

titution Act of 1996 ("MVRA"), Pub. L. No. 104-132, 110 Stat. 1227, governing the payment of restitution to crime victims, and the other, the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1461,[1] regulating private pension plans. Underlying each statute is a weighty policy determination: MVRA rests on the recognition that "[i]t is essential that the criminal justice system recognize the impact that crime has on the victim, and, to the extent possible, ensure that [the] offender be held accountable to repay these costs." S. Rep. No. 104-179, at 18 (1995). ERISA is meant to assure that "[r]etirement funds shall remain inviolate until retirement." *Boggs v. Boggs*, 520 U.S. 833, 851 (1997) (quoting JOHN H. LANGBEIN & BRUCE A. WOLK, PENSION AND EMPLOYEE BENEFIT LAW 547 (2d ed. 1995)) (internal quotation mark omitted). Taking a close look at the statutory implementation of these two important policies, we conclude that criminal restitution orders can be enforced by garnishing retirement funds, but with the funds only payable when the defendant has a current, unilateral right to receive payments under the terms of the retirement plan.

## I.

From 1995 to 1999, Raymond Novak and his former wife, Norma Ortega Nance, engaged in a scheme to steal telephone equipment from the Nestlé Food Company, resell the equipment, and pocket the proceeds. Nance, a Nestlé employee, had access to the equipment, which she then passed along to Novak to sell. The scheme cost Nestlé over $3.3 million. Unsurprisingly, Novak did not report the earnings from this illicit trade on his federal tax returns.

In December 2002, Novak pleaded guilty, pursuant to a plea agreement, to Conspiracy to Transport Stolen Goods, 18 U.S.C. § 371, and Filing a False Tax Return, 26 U.S.C.

---

[1]Unless noted otherwise, all statutory citations are to the 2000 edition of the United States Code.

§ 7206(1). He received a twenty-four month prison term and three years of supervised release. The district court also "ordered that the defendant shall pay restitution in the total amount of $3,360,051.67 pursuant to [MVRA]." Novak was required to make an initial $25,000 restitution payment within three months of the plea hearing, with the balance "due during the period of imprisonment." He did not appeal that judgment.

Novak was employed by The May Department Stores Company from 1990 to 2003, during which time he was covered by the company's retirement plans. In July 2003, the U.S. Attorney's Office began asking May for records of Novak's interests in the company's retirement plans. May responded that Novak had earned benefits under two plans: The May Department Stores Company Retirement Plan ("May Retirement Plan") and The May Department Stores Company Profit Sharing Plan ("May Profit Sharing Plan"). Under the former plan, "Novak's annual accrued benefit payable as a single life annuity at age 65 was $10,836.00."[2] Under the latter plan, Novak's various index fund and company stock holdings had a total value of $142,245.11 as of September 30, 2003. May also noted that "[i]n accordance with the terms of the Plans, as a result of his termination, [Novak] is entitled to receive distributions of his benefits in The May Department Stores Company Retirement Plan and his accounts under The May Department Stores Company Profit Sharing Plan. In order to receive payment of his benefits and accounts, [Novak] must complete and submit an Application for Payment of Benefits (Form EB-50) . . . to the Plan Administrator."[3] Both plans come within the scope of ERISA.

As of September 2003, Novak's restitution payments were, under the terms of the restitution order, more than $3.3 million in arrears. The government is responsible for enforcing

---

[2] Novak will turn sixty-five in 2012.

[3] The record does not contain the full term of May's retirement plans.

restitution orders and turning the funds collected over to victims. *See* 18 U.S.C. §§ 3664(m)(1)(A)(i), 3612(c)(2). To implement this responsibility, the government moved for enforcement against Novak's assets by applying for and receiving a writ of garnishment directed to May, pursuant to the Federal Debt Collection Procedures Act ("FDCPA"). *See* 28 U.S.C. § 3205. Novak moved to quash the writ, arguing that the anti-alienation provision found in section 206(d)(1) of ERISA, 29 U.S.C. § 1056(d)(1), prevented such garnishment. The district court ruled that our interpretation of the ERISA anti-alienation provision in *United States v. Jackson*, 229 F.3d 1223 (9th Cir. 2000), which held that ERISA's anti-alienation provision applies to criminal restitution orders, prevented such garnishment. It therefore quashed the writ.

On the government's appeal, a divided panel held that MVRA overrides ERISA's anti-alienation provision. 441 F.3d 819 (9th Cir. 2006). The panel majority determined that *Jackson* did not control this case, because *Jackson* had not considered MVRA's statutorily mandated criminal restitution provisions. We reheard this appeal en banc to determine whether the government can garnish retirement plans covered by ERISA as a means of enforcing criminal restitution orders.[4] 457 F.3d 981 (9th Cir. 2006).

## II.

To address that question, we must resolve the apparent tension between a pair of statutory provisions that, on first glance, suggest different answers.

[1] On the one hand, the 1996 enactment of MVRA made criminal restitution orders enforceable against *all* of a defen-

---

[4]Because ERISA's coverage extends well beyond traditional pension plans, this opinion generally uses the term "retirement plans" to refer to all plans covered by ERISA that offer post-retirement income to employees.

dant's property, not excepting from its reach ERISA-covered retirement benefits. After dictating that restitution orders are enforceable in the same manner as criminal fines, 18 U.S.C. §§ 3663A(d), 3664(m)(1)(A)(i), section 206(c)(3) of MVRA states:

> The United States may enforce a judgment imposing a fine in accordance with the practices and procedures for the enforcement of a civil judgment under Federal law or State law. *Notwithstanding any other Federal law (including section 207 of the Social Security Act), a judgment imposing a fine may be enforced against all property or rights to property* of the person fined, except that—
>
> > (1)   property exempt from levy for taxes pursuant to [certain enumerated] section[s] of the Internal Revenue Code of 1986 shall be exempt from enforcement of the judgment under Federal law;[5]
> >
> > (2)   [FDCPA procedures for exempting certain property] shall not apply to enforcement under Federal law; and
> >
> > (3)   the provisions of . . . the Consumer Credit Protection Act [limiting the garnishment of disposable earnings] shall apply to enforcement of the judgment under Federal law or State law.

18 U.S.C. § 3613(a) (emphasis added).[6]

---

[5]A set of annuity and retirement payments made to former members of the Armed Services and railroad workers are included in this exemption. 26 U.S.C. § 6334(a)(6).

[6]Section 3613 also allows unpaid MVRA restitution orders to serve as "a lien in favor of the United States on all property and rights to property

**[2]** At the same time, ERISA broadly protects covered retirement benefits from dissipation through payment to third parties, even if the payments are authorized by a plan participant or would otherwise be valid by force of law. Under Section 206 of ERISA, "[e]ach pension plan shall provide that benefits provided under the plan may not be assigned or alienated." 29 U.S.C. § 1056(d)(1); *see also* 26 U.S.C. § 401(a)(13)(A) (mandating that trusts are entitled to favorable retirement plan tax treatment only if they contain an anti-alienation provision). Section 206 includes two exceptions, for domestic relation orders and for offsets to recover for wrongs committed against the retirement plan. To "give[ ] full and appropriate effect to ERISA's goal of protecting pension benefits," the Supreme Court has "declined to recognize any [other] exceptions to ERISA's antialienation provision." *Patterson v. Shumate*, 504 U.S. 753, 764 (1992). In doing so, the Court has explained:

> Section 206(d) reflects a considered congressional policy choice, a decision to safeguard a stream of

---

of the person fined as if the liability of the person fined were a liability for a tax assessed under the Internal Revenue Code of 1986." 18 U.S.C. § 3613(c). "A federal tax lien, however, is not self-executing. Affirmative action by the IRS is required to enforce collection of the unpaid taxes. The Internal Revenue Code provides two principal tools for that purpose. The first is the lien-foreclosure suit [provided in 26 U.S.C. § 7403]. . . . The second tool is the collection of the unpaid tax by administrative levy [provided in 26 U.S.C. §§ 6331-6344]." *United States v. Nat'l Bank of Commerce*, 472 U.S. 713, 720 (1985). Collection under FDCPA is an alternate means of collecting money due the United States, independent of the tax lien provisions. *See* 28 U.S.C. §§ 3001(b), 3003(b)(1).

In this case, the U.S. Attorney's Office used FDCPA's procedures. The interplay between ERISA's anti-alienation provision and the statutes authorizing tax liens and detailing the procedures to enforce such liens is thus not directly pertinent to this case, and the dissent's references to the limitations of § 3613(c) therefore do not affect our interpretation. *See* Dissent at 2019-20. As noted below, however, ERISA's treatment of tax liens is relevant to the extent that the language of MVRA's enforcement provisions parallel the language of the tax lien provisions.

income for pensioners (and their dependents, who may be, and perhaps usually are, blameless), even if that decision prevents others from securing relief for the wrongs done them. If exceptions to this policy are to be made, it is for Congress to undertake that task.

*Guidry v. Sheet Metal Workers Nat'l Pension Fund*, 493 U.S. 365, 376 (1990).

## A.

Our effort to reconcile the broad MVRA enforcement provision and ERISA's stringent prohibition on alienation of pension benefits begins with the language of MVRA, allowing the enforcement of criminal restitution orders against "*all* property or rights to property," "[*n*]*otwithstanding* any other Federal law." 18 U.S.C. § 3613(a) (emphases added).

[3] By its use of the "*all* property or rights to property" language, *id.* (emphasis added), Congress has made quite clear that the totality of defendants' assets will be subject to restitution orders. The Supreme Court emphasized the breadth of the "all property or rights to property" phrase in the context of tax collection statutes: "The statutory language 'all property and rights to property,' . . . is broad and reveals on its face that Congress meant to reach *every* interest in property. . . ." *United States v. Nat'l Bank of Commerce*, 472 U.S. 713, 719-20 (1985) (emphasis added) (quoting 26 U.S.C. § 6321). This language, so read, requires that retirement plan benefits can be garnished to fulfill criminal restitution orders. Because ERISA's anti-alienation provision conflicts with this crystal clear command of § 3613(a), we must determine how to square the statutory conflict.

[4] The MVRA statutory language not only establishes this conflict but also provides guidance on how to resolve it, by specifying that all property is covered "[n]otwithstanding any

other Federal law." 18 U.S.C. § 3613(a). The Supreme Court has indicated as a general proposition that statutory "notwithstanding" clauses broadly sweep aside potentially conflicting laws. *See Cisneros v. Alpine Ridge Group*, 508 U.S. 10, 18 (1993) ("As we have noted previously in construing statutes, the use of such a 'notwithstanding' clause clearly signals the drafter's intention that the provisions of the 'notwithstanding' section override conflicting provisions of any other section. Likewise, the Courts of Appeals generally have interpreted similar 'notwithstanding' language . . . to supersede all other laws, stating that '[a] clearer statement is difficult to imagine.' " (omission and alteration in original) (citation and internal quotation marks omitted)); *see also Student Loan Fund of Idaho, Inc. v. U.S. Dep't of Educ.*, 272 F.3d 1155, 1166 (9th Cir. 2001) ("[T]he '[n]otwithstanding any other provision of law' clause demonstrates that Congress intended to supersede any previously enacted conflicting provisions." (second alteration in original)).

In examining specific statutes, we have not, however, always accorded universal effect to the "notwithstanding" language, standing alone. *See Or. Natural Res. Council v. Thomas*, 92 F.3d 792, 796 (9th Cir. 1996) ("We have repeatedly held that the phrase 'notwithstanding any other law' is not always construed literally." (citing *E.P. Paup Co. v. Dir., Office of Workers Comp. Programs*, 999 F.2d 1341, 1348 (9th Cir. 1993); *Kee Leasing Co. v. McGahan* (*In re The Glacier Bay*), 944 F.2d 577, 582 (9th Cir. 1991); *Golden Nugget, Inc. v. Am. Stock Exch., Inc.*, 828 F.2d 586, 588-89 (9th Cir. 1987) (per curiam))). Instead, we have determined the reach of each such "notwithstanding" clause by taking into account the whole of the statutory context in which it appears. *See id.* at 797 ("[O]ther subsections of the . . . Act suggest Congress did not intend the phrase 'notwithstanding any other law' to require the agency to disregard all otherwise applicable laws. . . . '[M]indful . . . of the common-sense principle of statutory construction that sections of a statute generally should be read to give effect, if possible, to every clause,' we decline to

adopt the broadest possible interpretation of 'notwithstanding any other provision of law' . . . ." (third omission in original) (quoting *Heckler v. Chaney*, 470 U.S. 821, 829 (1985))); *see also Nw. Forest Resource Council v. Pilchuck Audubon Soc'y*, 97 F.3d 1161, 1167 (9th Cir. 1996) (holding that a "notwithstanding" phrase is not dispositive where the second statute incorporates other laws by using terms that refer to them); *Glacier Bay*, 944 F.2d at 582 (holding that a "notwithstanding" phrase is not independently dispositive where the second statute incorporates "other applicable" laws).

The overall context of MVRA dictates giving full effect to its use of the "notwithstanding" language as applied to ERISA's anti-alienation requirement. In particular, two contextual aspects of the restitution enforcement provision found in 18 U.S.C. § 3613(a) — its treatment of other types of otherwise inalienable property and, most importantly, its replication of the language authorizing tax levies — make it clear that MVRA's criminal restitution enforcement orders do override ERISA's alienation restrictions. Our interpretation also accords with case law concerning how to reconcile statutes enacted at different times.

**1.** MVRA explicitly approved the government's authority to reach some post-retirement payments in the restitution enforcement provision, and did so in a manner that suggests a general intention to override federal statutory anti-alienation provisions except as otherwise specified in MVRA itself.

**[5]** Section 3613(a) specifies that one of the federal laws "*includ*[*ed*]" within the "notwithstanding" clause is section 207 of the Social Security Act. 18 U.S.C. § 3613(a) (emphasis added). Similar to ERISA's anti-alienation provision, section 207 of the Social Security Act dictates that "[t]he right of any person to any future payment . . . shall not be transferable or assignable, at law or in equity, and none of the moneys paid or payable or rights existing . . . shall be subject to execution, levy, attachment, garnishment, or other legal process, or to the

operation of any bankruptcy or insolvency law." 42 U.S.C. § 407(a). Unlike ERISA, however, the Social Security Act further specifies that "[n]o other provision of law . . . may be construed to limit, supersede, or otherwise modify the provisions of this section except to the extent that it does so by express reference to this section." *Id*. § 407(b). MVRA supplies that "express reference," stating that the "[n]otwithstanding any other Federal law" override "includ-[es] section 207 of the Social Security Act." 18 U.S.C. § 3613(a).

**[6]** There was no need similarly to specify other anti-alienation statutes, such as section 206(d) of ERISA, that do not mandate a clear statement for override.[7] The "all property" and "notwithstanding" clauses, taken together, were sufficient to accomplish that end. Indeed, Congress has afforded *greater* protections to Social Security benefits against alienation than those afforded to retirement plans covered by ERISA. *See Wright v. Riveland*, 219 F.3d 905, 920-21 (9th Cir. 2000) (holding that ERISA's anti-alienation provision does not prevent the seizure of retirement funds once distributed to the beneficiary and comparing the provision with the more encompassing anti-alienation restrictions of the Social Security Act). It would thus be anomalous to interpret § 3613(a) as abandoning the protection of Social Security benefits but not of retirement plans covered by ERISA. We conclude that by making clear that the "notwithstanding" clause "includes" the one federal anti-alienation provision that demands explicit statutory override, Congress manifested that § 3613(a) means what it says — that it reaches "*all* property or rights to property" not excepted, 18 U.S.C. § 3613(a) (emphasis added),

---

[7]The dissent's suggestion that MVRA's failure expressly to include the ERISA anti-alienation clause as well as section 207 of the Social Security Act signifies an intent to exclude the former, Dissent at 2018-19, disregards the special feature of section 207 of the Social Security Act — that it explicitly requires that any modification be "by express reference to this section," 42 U.S.C. § 407(b).

including property otherwise covered by federally mandated anti-alienation provisions. *Cf. Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 114-15 (2001) (invoking the statutory canon of *ejusdem generis* so as to interpret the general terms in a statute with reference to specific examples given in the statute).

This conclusion is reinforced by another structural feature of § 3613(a): Not only did Congress expressly override the one anti-alienation provision that it could remove only through such a reference, but it also specified that restitution orders could not be enforced against certain retirement plans even though those plans were already covered by anti-alienation statutes.

Four narrow types of federally-authorized pensions — Railroad Retirement Act pensions, Railroad Unemployment Insurance Act benefits, pensions received by those on the Armed Forces Medal of Honor rolls, and certain pensions paid to military servicemembers in lieu of retirement pay — are excluded from the "notwithstanding" language of the restitution enforcement provision. 18 U.S.C. § 3613(a)(1) (citing 26 U.S.C. § 6334(a)(6)). The federal statutes that establish all four of those pension programs already contain anti-alienation provisions similar to that found in ERISA. *See* 45 U.S.C. § 231m(a) (Railroad Retirement Act); *id.* § 352(e) (Railroad Unemployment Insurance Act); 38 U.S.C. § 1562(c) (Medal of Honor pensions); 10 U.S.C. §§ 1440, 1450(i), 1460a(b) (Retired Serviceman's Family Protection Plan, Survivor Benefit Plan, and Supplemental Survivor Benefit Plan). By carving out these retirement plans from the operation of § 3613(a), Congress indicated that, in light of the "notwithstanding" clause and the breadth of the "all property" language, the anti-alienation provisions in the federal pension statutes would not suffice to protect retirement benefits from garnishment and similar orders enforcing criminal fines and restitution orders. Except on this understanding the explicit exclusion of the referenced pensions was unnecessary, as the exclusion would

have been accomplished by the anti-alienation provisions in the statutes establishing the pension plans.

We avoid whenever possible statutory interpretations that result in superfluous language. *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001). Applying that precept, we regard the express and specific § 3613(a)(1) retirement plan exclusions as indicating that other federally regulated pension plans containing anti-alienation provisions, such as those covered by ERISA, are covered by the statutory trump worked by the broad "all property" and "notwithstanding" guidance.[8]

The inclusion of Social Security benefits and exclusion of certain retirement plans from the operation of § 3613(a) is important to our inquiry for another, related reason: Inclusion of these two references in § 3613(a) demonstrates that Congress focused quite directly upon the problem of allowing the enforcement of restitution orders against retirement plan assets and determined to allow such enforcement except as specified. The failure to include retirement plans covered by ERISA on the list of excluded retirement plans thus has substantial significance. *See Tang v. Reno*, 77 F.3d 1194, 1197 (9th Cir. 1996) ("[A]n item which is omitted from a list of exclusions is presumed not to be excluded." (alteration in original) (quoting *Qi-Zhuo v. Meissner*, 70 F.3d 136, 139 (D.C. Cir. 1995)) (internal quotation marks omitted)); *Hale v. Arizona*, 993 F.2d 1387, 1392 (9th Cir. 1993) (en banc) (finding significance in the absence of prisoners from a list of employees exempt from minimum wage laws).

---

[8]The dissent's attempt to explain these four exceptions, Dissent at 2017-19, will not wash. The very same specific/general and implied repeal principles upon which the dissent relies — incorrectly, as we will explain — would apply to the four anti-alienation provisions specifically excepted. Had Congress intended to exclude the ERISA provision as well, there is no reason it would have treated the ERISA provision differently from the others as a matter of legislative drafting.

**[7]** In sum, the treatment in § 3613(a) of other federal statutory anti-alienation provisions indicates that Congress intended to override ERISA's anti-alienation provision and allow the government to reach defendants' ERISA-covered retirement plan benefits when enforcing criminal restitution orders.

**[8] 2.**   There is a second, critical indication in the language and structure of § 3613(a) that the criminal restitution enforcement provision overrides ERISA's anti-alienation provision: Section 3613(a) contains language nearly replicating language used in a parallel statute specifying the property subject to tax levy. That language was understood before the enactment of § 3613(a) to permit levying on ERISA-covered retirement plan benefits.

The tax levy statute provides that "[n]otwithstanding any other law of the United States (including section 207 of the Social Security Act), no property or rights to property shall be exempt from levy other than the property specifically made exempt by subsection (a)." 26 U.S.C. § 6334(c). MVRA, once again, states:

> Notwithstanding any other Federal law (including section 207 of the Social Security Act), a judgment imposing a fine may be enforced against all property or rights to property of the person fined, except that —
>
>> (1) property exempt from levy for taxes pursuant to [certain enumerated] section[s] of the Internal Revenue Code of 1986 shall be exempt from enforcement of the judgment under Federal law;
>>
>> (2) [FDCPA procedures for exempting certain property] shall not apply to enforcement under Federal law; and

> (3) the provisions of . . . the Consumer Credit Protection Act [limiting the garnishment of disposable earnings] shall apply to enforcement of the judgment under Federal law or State law.

18 U.S.C. § 3613(a). The primary linguistic distinction between these two provisions is that the tax levy statute speaks in the negative — specifying that "*no property* or rights to property shall be *exempt*" — while MVRA makes precisely the same point affirmatively — "a fine may be *enforced* against *all property* or rights to property."**⁹**

The similarity between these statutory phrases is not happenstance: Before Congress enacted the current language of § 3613 in 1996 as part of MVRA, the enforcement statute had cross-referenced the tax levy provisions. 18 U.S.C. § 3613(c) (1994) ("The provisions of section[ ] . . . 6334 . . . of the Internal Revenue Code . . . apply to a fine . . . as if the liability of the person fined were for an internal revenue tax assessment, except to the extent that the application of such statutes is modified by regulations issued by the Attorney General to accord with differences in the nature of the liabilities."). This similar use of language is critical to our endeavor to understand the interaction of MVRA and ERISA, for two reasons:

*First*, this court has construed the tax levy language as rendering ERISA's anti-alienation provision inapplicable. *McIntyre v. United States* (*In re McIntyre*), 222 F.3d 655, 660 (9th

---

**⁹**The dissent wrongly attributes significance to the "other than the property specifically made exempt by subsection (a)" language of 26 U.S.C. § 6334(c). Dissent at 2020. Section 6334 codifies the tax levy exemptions in a separate subsection, while MVRA codifies the restitution exceptions in the same subsection. This drafting difference required a cross-reference in § 6334 absent in § 3613, but does not suggest that one list of exceptions is exclusive while the other is not. To the contrary, our case law dictates that when Congress provides a list of exceptions in a statute, that list is presumed exclusive. *See Tang*, 77 F.3d at 1197; *Hale*, 993 F.2d at 1392.

Cir. 2000). *McIntyre*'s reasoning rested both on the plain language of the tax levy provision and on ERISA's saving clause provision, which specifies "[n]othing in this subchapter [which includes the anti-alienation provision] shall be construed to alter, amend, modify, invalidate, impair, or supersede any law of the United States." *Id.* (second alteration in original) (quoting 29 U.S.C. § 1144(d)) (internal quotation marks omitted).

Our decision in *McIntyre* is consistent with our earlier observation that "courts have construed the plain language of § 6334 literally and have refused to exempt property from IRS levy which is not specifically exempted by the statute." *Beam v. IRS* (*In re Beam*), 192 F.3d 941, 944 (9th Cir. 1999); *see also United States v. Mitchell*, 403 U.S. 190, 205 (1971) ("This language [of § 6334(c)] is specific and it is clear and there is no room in it for automatic exemption of property that happens to be exempt from state levy under state law."). Ruling otherwise in the face of the "notwithstanding" language, we said, would "ignore[ ] the specifically stated intent of Congress to limit the instances where an IRS levy may not attach." *Beam*, 192 F.3d at 945. *McIntyre*'s understanding of the combination of the "notwithstanding" phrase and the broad substantive coverage of the tax levy provision also accords with that adopted by other federal courts. *See United States v. Taylor*, 338 F.3d 947, 950 n.3 (8th Cir. 2003) ("The IRS has authority to proceed against [pensioner's] interest in any ERISA plan benefits and is not constrained by ERISA's anti-alienation provision." (quoting *McIntyre*, 222 F.3d at 660) (internal quotation marks omitted)); *Shanbaum v. United States*, 32 F.3d 180, 183 (5th Cir. 1994) (per curiam) (holding a taxpayer's argument that the anti-alienation provision affects the tax levy authority of the IRS to be "without merit"); *id.* at 183 n.4 (citing a number of district court and bankruptcy court decisions that come to the same conclusion).

The reasoning in *McIntyre* equally applies in the restitution order context. The reference in 18 U.S.C. § 3613(a) to "*all*

property" is no less plain than the "*no* property" reference in 26 U.S.C. § 6334(c). And prohibiting the garnishment of retirement plan benefits would just as clearly "modify" the government's authority under 18 U.S.C. § 3613(a) to enforce criminal restitution orders against "all property" as would such a prohibition "modify" the government's authority under 26 U.S.C. § 6334(c) to enforce tax liens.

Moreover, courts generally interpret similar language in different statutes in a like manner when the two statutes address a similar subject matter. *See Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 65 (1987) (noting a presumption that similar language in two statutes both addressing the same subject, labor law, would have a similar meaning); *Northcross v. Bd. of Educ.*, 412 U.S. 427, 428 (1973) (per curiam) (holding that the "strong indication that the two statutes should be interpreted *pari passu*" because of a similarity in language was reinforced by the fact that "the two provisions share a common *raison d'être*" (quoting *Johnson v. Combs*, 471 F.2d 84, 86 (5th Cir. 1972)) (internal quotation marks omitted)). Here, the two statutes both address the government's enforcement of citizens' monetary obligations through seizure of pension benefits and are historically linked. The broad interpretation of the "notwithstanding" language in the tax levy statute to include coverage of retirement plans should therefore carry over to the criminal restitution provision.

*Second*, Congress's choice to import the tax levy language into the restitution order enforcement statute is significant, independent of the propriety of our decision in *McIntyre*, because courts had uniformly construed the tax levy statute to supersede ERISA's anti-alienation provision before the "notwithstanding" language was added to § 3613(a). *Shanbaum*, 32 F.3d at 183; *Travelers Ins. Co. v. Rattermann*, No. C-1-94-466, 1996 WL 149332, at *3-4 (S.D. Ohio Jan. 12, 1996) ("Although ERISA's anti-alienation clause prevents ordinary creditors from attaching pension payments, the courts that have dealt with the particular issue . . . *have unanimously held*

that a federal tax lien or levy may be imposed upon private ERISA-qualified pension plan funds." (emphasis added)); *Jacobs v. IRS* (*In re Jacobs*), 147 B.R. 106, 108-09 (Bankr. W.D. Pa. 1992); *see also* Treas. Reg. § 1.401(a)-13(b)(2) (interpreting, in a provision promulgated in 1978, the parallel anti-alienation provision under the Internal Revenue Code to allow tax levies). We presume that Congress is aware of pre-existing judicial interpretations of statutory language it replicates in later statutes, and that it seeks to import those interpretations into the new statute. *See Cannon v. Univ. of Chi.*, 441 U.S. 677, 696-98 (1979).

It is particularly noteworthy, given this close replication of earlier-construed statutory language, that Congress *was* aware of the ERISA anti-alienation issue when MVRA was under consideration. During the Senate's December 1995 debate on MVRA, Senator McCain detailed faults he found with the bill, including its failure to amend ERISA to allow the garnishment of retirement plans to satisfy restitution orders. 141 CONG. REC. S19,282 (daily ed. Dec. 22, 1995). The version of MVRA under consideration at that time did not include the language of the present 18 U.S.C. § 3613(a). *See* H.R. 665, 104th Cong. § 106(c)(3) (as passed by Senate, Dec. 22, 1995). Significantly, Senator Hatch informed Senator McCain that the Judiciary Committee intended to consider such concerns. 141 CONG. REC. S19,282 (daily ed. Dec. 22, 1995). Senator McCain also introduced freestanding legislation in February 1996 to amend ERISA to permit retirement plan garnishment as a means of enforcing restitution orders. *See* S. 1570, 104th Cong. (1996).

**[9]** The language of the present § 3613(a), including the "notwithstanding" phrase, first appeared in the bill that became MVRA when it emerged from the joint House/Senate Conference Committee in April 1996. S. 735, 104th Cong. § 207(c)(3) (as reported by Conference Committee, Apr. 15, 1996). The Conference Report does not explain this addition, noting merely that the bill adopted the Senate's language "to-

gether with perfecting amendments." H.R. REP. No. 104-518, at 111 (1996) (Conf. Rep.). Nevertheless, in light of the concern about the ERISA anti-alienation provision expressed earlier in the legislative process, the assurance that such concerns would be considered, and the existing interpretation of similar language addressing the closely parallel tax levy situation, the strong likelihood is that the sudden appearance of the current § 3613(a) language at the end of the legislative process was linked to the earlier-expressed concern.

**3.** In light of these considerations, that MVRA followed rather than preceded ERISA is of no moment. Because statutory repeals by implication are disfavored, courts presume that by passing a new statute Congress ordinarily does not intend to displace laws already in effect. *See Posadas v. Nat'l City Bank*, 296 U.S. 497, 503 (1936). Our case law concerning application of this presumption against implied repeals, however, supports rather than detracts from our interpretation of MVRA.[10] Our implied repeal cases indicate that when a "notwithstanding" clause is present, then, the usual presumption against implied repeals is mitigated in that (1) a later statute that conflicts with an earlier one should be considered to supersede the earlier statute if the only way that earlier one can stand is as a limited exception to the broad terms of the

---

[10]We are not sure that a latter-enacted statute effects an implied repeal by merely creating a limited category of cases in which the earlier statute does not apply. The Tenth Circuit has observed that it "see[s] no repeal-by-implication problem" when a "later statute simply addresses one particular application [of the former statute] and carves out an exception." *Harris v. Owens*, 264 F.3d 1282, 1296 (10th Cir. 2001); *see also Strawser v. Atkins*, 290 F.3d 720, 733 (4th Cir. 2002) ("Rather than repeal by implication a general statute, the . . . amendment simply created a specific, discrete exception to that statute." (citation omitted)); *Greenless v. Almond*, 277 F.3d 601, 608 (1st Cir. 2002) ("The 'implied repeal' argument is an odd one because at issue is not whether Congress totally repealed [the statute], but whether it intended to carve out [a certain application] from the reach of that provision."). We assume for purposes of this opinion, however, that the implied repeal canon of construction applies to implied limitations as well.

later one; and (2) the "notwithstanding" clause, *combined* with other convincing indices of statutory intent, will suffice to make manifest that there is indeed an irreconcilable conflict such that the two statutes dictate opposite results as to a particular matter.

As to the first point: We have recognized that "including a 'notwithstanding any other law' provision" is a method — akin to an express reference to the superseded statute — by which Congress can demonstrate that it "intended to partially repeal [an] Act." *Lujan-Armendariz v. INS*, 222 F.3d 728, 747 (9th Cir. 2000); *see also Bank of New Eng. Old Colony, N.A. v. Clark*, 986 F.2d 600, 604 (1st Cir. 1993) ("The . . . statute began by stating '[n]otwithstanding any other provision of law . . . ,' manifesting a clear intent to override any conflicting statutes in existence."). In *Lujan-Armendariz*, Judge Reinhardt explained that in some circumstances an earlier enactment will be understood as a minor exception to the later one so as to avoid a repeal by implication, relying on the "irreconcilable conflict" prong of the implied repeal presumption explained in *Radzanower v. Touche Ross & Co.*, 426 U.S. 148 (1976). 222 F.3d at 743-44. There was no "notwithstanding" clause in *Radzanower* however, and, as *Lujan-Armendariz* indicates, when the question is whether "Congress . . . intend[ed] to bar . . . exceptions to the new [statute's] literal terms," a "notwithstanding" clause can serve as an "indication . . . that the new law was intended to displace" the old one. *Id.* at 747.

As to the second implied repeal limitation summarized above: In *Moyle v. Director, Office of Workers' Compensation Programs*, 147 F.3d 1116 (9th Cir. 1998), the "plain language of the [later statutory] provision and its legislative history demonstrate[d] the legislature's 'clear and manifest' intent to repeal the [earlier] Anti-Alienation provision," in a case in which "two provisions irreconcilably conflict because the [later] provision permits garnishment of [certain pension] benefits and the [earlier] Anti-Alienation provision prohibits

such garnishment." *Id*. at 1124. Similarly here, the "notwith-standing" clause is not the only statutory indication of Congressional intent on § 3613. Giving effect to the "notwithstanding" clause *in conjunction with* the breadth of the "all property or rights to property" language; the express inclusion of Social Security retirement benefits in the reach of "all property or rights to property"; the specific exclusion of certain federal pensions that have their own anti-alienation provisions; and the use of language derived from the tax levy statute, previously construed by courts to allow seizure of ERISA-covered retirement plan benefits, we conclude that Congress has expressed its intent to override the statute in sufficiently clear terms to overcome any contrary presumption.

\* \* \*

**[10]** In sum, all standard principles of statutory construction support the conclusion that MVRA authorizes the enforcement of restitution orders against retirement plan benefits, the anti-alienation provision of ERISA notwithstanding.

## B.

We do not, however, write on an entirely clean slate regarding the scope and application of ERISA's anti-alienation provision. *Guidry*, decided by the Supreme Court in 1990, reviewed the intersection of section 206(d) of ERISA, the anti-alienation provision, with another federal statute, the Labor-Management Reporting and Disclosure Act of 1959 ("LMRDA"), 29 U.S.C. §§ 141-187. Novak's principal argument is that *Guidry* requires us to apply the ERISA anti-alienation provision to the enforcement of restitution orders under MVRA. We do not agree. To explain why, we first examine *Guidry* in detail and then consider its application to this case.

**1.** *Guidry* involved an individual convicted of embezzling funds from a union. 493 U.S. at 367-68. The union sought to

recover its losses by asking the district court to impose a constructive trust on benefits owed Guidry by two pension funds, "so that the benefits would be paid to the Union rather than to petitioner." *Id*. at 369. Considering such a constructive trust as akin to garnishment, the Supreme Court held that such a remedy is "prohibited by § 206(d)(1) unless some exception to the general statutory ban is applicable." *Id*. at 371-72. The Court then considered two possible sources of such an exception: the provision of the LMRDA permitting, "under certain conditions, a private right of action 'to recover damages or secure an accounting or other appropriate relief for the benefit of the labor organization,' " *id*. at 374 (quoting 29 U.S.C. § 501(b)), and a "generalized equitable exception" to the anti-alienation provision, *id*. at 376.[11]

Noting that the LMRDA contained a "general reference" stating that those harmed by a union officer's breach of fiduciary duty could secure "other appropriate relief," *id.*, the Supreme Court assumed that such general language "may authorize, in some circumstances, the imposition of a constructive trust," *id*. at 374. Invoking the "elementary tenet of statutory construction" that a general statute will not alter a more specific one, however, the Court held that ERISA's anti-alienation provision controlled, so that the trust remedy was not available. *Id.* at 375-76 (citing *Morton v. Mancari*, 417 U.S. 535, 550-51 (1974)). ERISA's anti-alienation provision is more specific, held the Court, because it delineated the "particular means" through which "judgment[s] may be collected," while the LMRDA only discussed "what sort of judgment the aggrieved party may obtain." *Id*. at 376 (emphasis omitted). Ruling otherwise "would eviscerate the protections

---

[11]ERISA's fiduciary duty provisions did not apply to the facts of *Guidry*, because the beneficiary embezzled funds not from the pension fund but from the legally distinct union. 493 U.S. at 373. The Supreme Court therefore chose not to decide whether ERISA provisions that create liability for the breach of fiduciary duty would override the statute's anti-alienation provision. *Id*.

of § 206(d)," because "ERISA's anti-alienation provision would be inapplicable whenever a judgement creditor relied on the remedial provisions of a federal statute." *Id*. at 375.

As our discussion to this point indicates, *Guidry* simply relied upon the generally applicable principle that "[w]here there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one." *Id*. (alteration in original) (quoting *Mancari*, 417 U.S. at 550-51) (internal quotation marks omitted); *see also Coar v. Kazimir*, 990 F.2d 1413, 1420 (3d Cir. 1993) ("*Guidry* did not state that section 206(d)(1) is immutable. Rather, the Court's main reason for not overriding the anti-alienation provision through the LMRDA was that the LMRDA's provision was general whereas the anti-alienation provision in ERISA was specific."), *cited with approval in Parker v. Bain*, 68 F.3d 1131, 1140 (9th Cir. 1995). Notably, *Guidry* did *not* apply a special plain statement rule, requiring that Congress explicitly mention the ERISA anti-alienation provision in an ensuing statutory provision in order to negate the ERISA provision. Nor did *Guidry* demand that sufficiently specific statutory exceptions be codified within the text of ERISA itself. Instead, *Guidry*'s premises were, first, that the LMRDA does not address at all the enforcement of judgments obtained under § 501(b), let alone garnishment of retirement benefits, and second, that there was no "clear intent," however expressed, that the very general provision of § 501(b) override the specific language of section 206(d)(1) of ERISA.

When the specific-versus-general canon does not apply and therefore *Guidry*'s holding is inapplicable, there is nothing in the language of ERISA's anti-alienation provision that demands that Congress act with special clarity in altering its coverage.[12] Nor does the anti-alienation provision involve

---

[12]In fact, it is an open question whether Congress could validly impose such a clear statement rule even if it wanted to do so. *See Lockhart v. United States*, 126 S. Ct. 699, 703-04 (2005) (Scalia, J., concurring) (arguing that Supreme Court case law dictates that statutory express statement requirements are invalid).

"traditionally sensitive areas, such as legislation affecting the federal balance," where clear statement rules have been judicially created to protect bedrock constitutional principles such as separations of powers or federalism. *Gregory v. Ashcroft*, 501 U.S. 452, 461 (1991) (quoting *United States v. Bass*, 404 U.S. 336, 349 (1971)).

After discussing the LMRDA issue, *Guidry* went on to reject a generalized equitable exception to ERISA's anti-alienation provision. The Court held it inappropriate to create an exception that Congress did not provide. *Guidry*, 493 U.S. at 376-77. It is this portion of *Guidry* that the Supreme Court has emphatically reiterated in later opinions. *See Boggs*, 520 U.S. at 851 ("ERISA's pension plan anti-alienation provision is mandatory and contains only two explicit exceptions which are *not subject to judicial expansion*. See *Guidry v. Sheet Metal Workers Nat. Pension Fund*, 493 U.S. 365, 376 (1990)." (emphasis added) (citation omitted)); *Patterson*, 504 U.S. at 760 ("[T]his Court itself vigorously has enforced ERISA's prohibition on the assignment or alienation of pension benefits, declining to recognize any *implied exceptions* to the broad statutory bar. See *Guidry v. Sheet Metal Workers Nat. Pension Fund*, 493 U.S. 365 (1990)." (emphasis added)).[13]

---

[13]*Patterson* addressed a situation in which the second statute — there, the Bankruptcy Code — states that it does *not* operate when "applicable nonbankruptcy law" dictates otherwise. 504 U.S. at 757 (quoting 11 U.S.C. § 541(c)(2)) (internal quotation marks omitted). The second statute in the case before us states quite the opposite — that it applies "[n]otwithstanding any other Federal law." 18 U.S.C. § 3613(a). *Patterson*'s emphasis on "clarity of the statutory text" in delineating which statute prevails in case of a conflict, 504 U.S. at 760, thus supports the conclusion that § 3613(a) *does* override ERISA's anti-alienation provision. *See id.* at 766 (Scalia, J., concurring) (noting that courts of appeals decisions disregarding the explicit designation in a statute of the statutory hierarchy "call[ ] into question whether our legal culture has so far departed from attention to text, or is so lacking in agreed-upon methodology for creating and interpreting text, that it any longer makes sense to talk of 'a government of laws, not of men' ").

**[11] 2.** *Guidry*'s holding that general statutory authority, such as the LMRDA's private right of action provision, cannot overcome ERISA's anti-alienation provision when the ERISA provision is more specific has no application here, for two reasons:

**[12]** *First*, while the LMRDA addressed only "what sort of judgment the aggrieved party may obtain," MVRA addresses precisely the question of "whether [the] judgment may be collected through a particular means." *Guidry*, 493 U.S. at 376 (emphasis omitted). MVRA specifies that criminal restitution "may be *enforced* against *all* property or rights to property of the person fined." 18 U.S.C. § 3613(a) (emphases added). MVRA is therefore much more specific than is the LMRDA in addressing the same issue addressed by the ERISA anti-alienation provision.

**[13]** *Second*, even if one were to consider the LMRDA relief and the MVRA enforcement provisions to be at the same level of generality — which they are not — MVRA, unlike the LMRDA, expresses a "clear intention," *Guidry*, 493 U.S. at 375 (quoting *Mancari*, 417 U.S. at 550), that MVRA supersede the ERISA anti-alienation provision. That "clear intention," as we have seen, is expressed in the "notwithstanding" clause; the breadth of the "all property or rights to property" language; the express inclusion of Social Security retirement benefits in the reach of "all property or rights to property"; the specific exclusion of certain federal pensions that have their own anti-alienation provisions; and, perhaps most importantly, the use of language derived from the tax levy statute, previously construed by courts to allow seizure of ERISA-covered retirement plan benefits. *Guidry*'s statutory canon discussion thus does not support holding that ERISA overrides MVRA's enforcement provision.

*Guidry*'s holding concerning the creation of equitable exceptions to ERISA's anti-alienation provision is not pertinent either. We are examining a means of enforcement

expressly authorized by MVRA, not one implied without a statutory basis. There is no question that the government would have the statutory right to garnish retirement benefits were it not for the ERISA anti-alienation provision.

**3.** Our analysis of *Guidry*, we note, is consistent with the Third Circuit's examination of that decision in a case holding that ERISA's fiduciary duty provisions override the anti-alienation provision, and with our approval of the Third Circuit's holding. Addressing the question that the Supreme Court explicitly declined to answer in *Guidry*, *see supra* note 11, the Third Circuit cautioned against "constru[ing] *Guidry*'s holding too broadly and plac[ing] insufficient emphasis on the wording" of the conflicting statutory provisions. *Coar*, 990 F.2d at 1419. Abiding by that caution, *Coar* allowed a pension plan to set off the benefits it owed to a trustee by the amount of injury his breach of fiduciary duty caused to the plan. *See id.*; *see also Crawford v. La Boucherie Bernard Ltd.*, 815 F.2d 117, 121-22 (D.C. Cir. 1987) (adopting the same holding pre-*Guidry*). We have "note[d] . . . our agreement" with the holding of *Coar*. *Parker*, 68 F.3d at 1140.

*Coar*, along with the similar holdings of our court and the D.C. Circuit, is relevant to this case for an additional reason: It explains why a statutory exemption from ERISA's anti-alienation provision enacted in 1997, after *Guidry*, does not detract from our interpretation of § 3613(a). That exemption allows ERISA-covered retirement plans to "offset . . . a participant's benefits provided under an employee pension benefit plan against an amount that the participant is ordered or required to pay to the plan" on account of a conviction for committing a crime against the plan or a civil judgment or settlement agreement based on breaching ERISA's fiduciary duty provisions. 29 U.S.C. § 1056(d)(4). Contrary to the decisions noted above, the Fifth Circuit had held that *Guidry* prevented plans from setting off benefits owed to malfeasant fiduciaries. *Herberger v. Shanbaum*, 897 F.2d 801, 803-04 (5th Cir. 1990). Congress added a statutory exception to sec-

tion 206(d) of ERISA to resolve the circuit split on the interplay between the statutory provisions authorizing plans to use self-help to recover for the breach of fiduciary duty and the anti-alienation provision by overturning *Herberger*. *See* H.R. REP. NO. 105-220, at 757 (1997) (Conf. Rep.). Given Congress's focus in adding the offset exemption, that provision has no bearing on whether MVRA allows judicially approved garnishment of retirement benefits by third parties.

Moreover, by their very terms, MVRA and the exception in section 206(d)(4) address different issues. Unlike MVRA, the offset exception in section 206(d)(4) of ERISA does not address *the government's* right judicially to enforce restitution orders against retirement plans. *See Coar*, 990 F.2d at 1421 (distinguishing between set-offs and garnishment on the basis of third-party involvement). Instead, the 1997 ERISA amendment concerns the remedies *a plan* can use to recover for crimes perpetrated against it — without having to obtain the assistance of the U.S. Attorney's Office or to follow the procedure of FDCPA (or other statutes) that detail the steps the government must take to seize property. The fact that these offsets do not have to comply with such procedural statutes explains Congress's decision to include independent procedural safeguards in section 206(d)(4) but not in MVRA.

The 1997 exception to the ERISA anti-alienation provision is not informative concerning the reach of § 3613(a) for another reason: Section 206(d)(4)(A)(i) of ERISA is not limited, as is MVRA, to enforcement of restitution orders resulting from *federal* criminal convictions. It also provides retirement plans an offset right based on state court restitution orders. *See generally Commonwealth v. Federico*, 419 N.E.2d 1374, 1377-78 (Mass. 1981) ("[A] State is not precluded [by ERISA] from prosecuting, under a theft statute applicable to the entire population, an employer who steals money from an employee benefit plan, simply because the theft involved such a plan."); *State v. Pulasty*, 612 A.2d 952, 958 (N.J. Super. Ct. App. Div. 1992) ("[G]eneral [state] criminal laws, such as

those which punish larceny and theft, survive ERISA even where the subject of the theft is a pension plan or provider."), *aff'd on other grounds*, 642 A.2d 1392 (N.J. 1994).

**[14]** We therefore find nothing in *Guidry* or in post-*Guidry* congressional enactments to affect our conclusion that the government may enforce MVRA restitution orders against retirement benefits.

## C.

Our interpretation of the interplay of MVRA and ERISA accords with the unanimous interpretation by federal district courts around the country. *United States v. Lazorwitz*, 411 F. Supp. 2d 634, 636-37 (E.D.N.C. 2005) (rejecting a retirement plan's objection to a garnishment order to enforce MVRA restitution); *United States v. James*, 312 F. Supp. 2d 802, 805 (E.D. Va. 2004) (holding that "ERISA is no bar to garnishment of a qualified pension plan to collect a criminal restitution order" in rejecting a defendant's motion to quash a garnishment writ seeking to collect MVRA restitution payments); *United States v. Sowada*, No. 03-420, 2003 WL 22902613, at *2 (E.D. La. Dec. 8, 2003) (rejecting a defendant's objection to the garnishment of his retirement plan to enforce a restitution order); *United States v. Garcia*, No. 96-10049-01-JTM, 2003 WL 22594362, at *1-3 (D. Kan. Nov. 6, 2003) (overruling a retirement plan's objection to its garnishment to fund restitution); *United States v. Tyson*, 242 F. Supp. 2d 469, 470-74 (E.D. Mich.) (depending on § 3613 to reject a defendant's and a retirement plan's objection to a writ of garnishment to enforce a restitution order), *objections overruled*, 265 F. Supp. 2d 788 (E.D. Mich. 2003); *United States v. Rice*, 196 F. Supp. 2d 1196, 1200-02 (N.D. Okla. 2002) (depending on § 3613 to reject a retirement plan's argument that its assets were not subject to garnishment to enforce a restitution order).

Although no circuit courts have decided the precise issue here, our decision accords with *United States v. Irving*, 452

F.3d 110 (2d Cir. 2006), which held that MVRA allows a district court to consider a defendant's retirement plans as a source of funds to pay restitution when issuing a restitution order in the first instance. *Id.* at 126. The Second Circuit's analysis depended on its view that MVRA allows the government to enforce restitution orders against such plans. *Id.*

**[15]** Our decision does conflict with the holding of the three-judge panel in *Jackson*. The *Jackson* panel, however, did not have the benefit of any briefing on the interaction of the ERISA anti-alienation provision with MVRA. Having now had the opportunity to survey in detail the pertinent statutory landscape in its entirety, we conclude that the decision in *Jackson* was in error, albeit understandably so. We therefore overrule *Jackson* to the extent it conflicts with today's ruling.

**D.**

Nothing in the dissenting opinion undermines our analysis. The dissent engages in an exegesis on why the command that MVRA restitution orders "[*n*]*otwithstanding any other Federal law* . . . may be enforced against *all property* or rights to property," 18 U.S.C. § 3613(a) (emphases added), in fact means that *another Federal law limits* the application of MVRA restitution orders to *some property* not covered by any MVRA exception. This proposition not only flies in the face of the common sense meaning of the statutory text but also lacks legal support.

*First*, the dissent relies upon *Guidry* as creating a very special plain statement rule applicable to any statutory conflict involving ERISA's anti-alienation provision. *See* Dissent at 1998 ("As the Supreme Court explained in *Guidry* . . . only a *clear and specific legislative directive* is sufficient to defeat it." (emphasis added)); *id.* at 2001-02 ("*Guidry* requires an *unambiguous legislative command* to create an exception to ERISA's anti-alienation provision." (emphasis added)). As we have explained, this interpretation is inconsistent with *Guidry*,

which only demanded clear congressional intent *after* determining that the general-versus-specific statutory canon was relevant to the conflict in that case — which it is not here.[14]

*Second*, the dissent claims that standard textual analysis principles support its position. To reach this result, the dissent invites us to ignore provisions of MVRA inconsistent with its interpretation, including the "notwithstanding" clause, the "all property" coverage, and the limited exceptions for some anti-alienation clauses but not for ERISA. *See supra* notes 7-8. It also refuses to interpret MVRA's language in the same manner as the tax levy statute Congress, quite apparently, deliberately copied — for the sole reason that the tax provision predates ERISA, while MVRA was added later. Dissent at 2020.

In so doing, the dissent assigns unsupportable significance to the sequence of enactment and misreads the ERISA saving clause. *See Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 102 (1983) (holding ERISA's saving clause applies when ERISA otherwise would " 'modify' and 'impair' " "the enforcement scheme contemplated" by the Pregnancy Discrimination Act of 1978); *John Hancock Mut. Life Ins. Co. v. Watson* (*In re Kincaid*), 917 F.2d 1162, 1164 (9th Cir. 1990) (holding ERISA's saving clause applies in a conflict with the Bankruptcy Act of 1978). Such a reading would broaden the scope of ERISA preemption to cover federal laws. *See Kincaid*, 917 F.2d at 1164 (noting, according to its interpretation, that the ERISA saving clause "expressly prohibits ERISA preemption of other federal laws").[15] Also, even if this temporal distinc-

---

[14]Even if the dissent were correct that *Guidry* created a clear statement rule, its reliance on the fact that § 3613 does not "make[ ] any reference whatsoever to ERISA" cannot bear the weight placed on it. Dissent at 2004. A clear statement rule does not require an *explicit* reference to the overridden provision. *See Gregory*, 501 U.S. at 467 (citing *Dellmuth v. Muth*, 491 U.S. 223, 233 (1989) (Scalia, J., concurring)).

[15]Moreover, assigning such significance to the statutory sequence is in tension with *Guidry*. There, the statute that conflicted with ERISA's anti-

tion would otherwise matter, the dissent fails to account for Congress's choice to copy the tax levy language *after* courts had interpreted it to override section 206 of ERISA. Using statutory language previously construed as dictating a certain result in this manner provides the "unambiguous legislative command" that the dissent insists is lacking here. *See* Dissent at 2001.

Clarifying that these features of MVRA's language cannot be ignored exposes the critical flaw in the dissent's textual analysis: It fails to accord *any* import to the statute's choice of language. The dissent's analysis, based on its conclusion that "we determine the effect of 'notwithstanding' language according to the doctrine of implied repeals," Dissent at 2006, would be exactly the same had MVRA entirely lacked the "notwithstanding" language. If § 3613 contained only the statement that "a judgment imposing a fine may be enforced against all property or rights to property of the person fined," the presumption against implied repeals might render such language insufficient to overcome ERISA's anti-alienation provision. As we explained in Section II.A.3, however, the "notwithstanding" language, in *combination with* the numerous other indicia of statute's scope, override ERISA's anti-alienation provision. The dissent's failure to give this effect to the "notwithstanding" language, while construing section 206(d) of ERISA as an exception to the literal language of MVRA, runs counter to both *Lujan-Armendariz* and the principle that we must try to avoid construing statutory provisions as superfluous, *see TRW*, 534 U.S. at 31.

*Third*, the dissent scours legislative history looking for any shred of evidence that Congress did not intend MVRA to affect ERISA. The dissent initially focuses on Senator

---

alienation provision predated the enactment of ERISA. Yet, the Supreme Court neither gave any priority to the preexisting statute nor invoked the precept against repeal by implication when construing the more recent ERISA provision. *See Guidry*, 493 U.S. at 374-76.

McCain's actions in December 1995 and February 1996, even though the relevant language of MVRA did not emerge until later — *after* Senator McCain was assured that his concern *would* be accommodated, *as it was*. Nonetheless, the dissent dismisses our explanation of the critical legislative history — the Conference Committee's change — without offering any alternate explanation for the decision to add an entirely new subsection into the United States Code whose plain meaning, already construed by courts, worked the very result that Senator McCain desired. Dissent at 2009-11.[16]

The dissent then turns to the 1997 enactment of section 206(d)(4) of ERISA. The Supreme Court has cautioned that "subsequent legislative history is a 'hazardous basis for inferring the intent of an earlier' Congress," *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 650 (1990) (quoting *United States v. Price*, 361 U.S. 304, 313 (1960)). The dissent nonetheless places near-determinative weight in explaining the intent of Congress in 1996 on Congress's 1997 decision to add ERISA section 206(d)(4). Dissent at 2011-16. This

---

[16]Notably, the dissent's use of legislative history is far more speculative than ours. It credits the fact that the Senate Judiciary Committee never acted on one proposed bill as Congress's definitive decision that retirement plan payments could not be used to satisfy criminal restitution orders. Dissent at 2007-09. Although, in construing a statute we may properly consider Congress's *rejection* of amendments *to the bill* that became that statute, *see Hamdan v. Rumsfeld*, 126 S. Ct. 2749, 2766 (2006), a committee's failure to consider an entirely separate piece of legislation while altering the bill it is considering in a manner consistent with the proposed amendment has no such significance. *See Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 650 (1990) ("Congressional inaction lacks 'persuasive significance' because 'several equally tenable inferences' may be drawn from such inaction . . . ." (quoting *United States v. Wise*, 370 U.S. 405, 411 (1962))). Here, the most likely inference is that, given realities of the legislative process, it was much easier to attach language with settled meaning into MVRA in conference than to enact an amendment to an entirely separate statute, ERISA, and that Senator McCain likely so understood and was satisfied that his concerns had been met.

analysis is a particularly unsupportable inference in light of our explanation in section II.B.3 — that the 1997 provision focused on the inapposite circuit split about the scope of ERISA's fiduciary duty provision, and dealt with a different means of restitution that applies to a broader range of wrongdoing than MVRA. Moreover, the significance the dissent places on Congress's amendment of the tax statutes is belied by the fact that the tax statutes had already been interpreted to allow retirement plans to respond to tax levies, without any statutory provision, *United States v. Sawaf*, 74 F.3d 119, 123-24 (6th Cir. 1996), and by the IRS's own understanding that the tax laws do allow retirement plans to respond to MVRA restitution orders, *see infra* note 24 and accompanying text.

When all of the dissent's efforts to respond to our analysis are laid bare, the proper resolution of this case is all the more apparent: Congress actually meant what it said in specifying that enforcement of MVRA restitution would apply to "*all* property or rights to property" and "*notwithstanding* any other Federal law." 18 U.S.C. § 3613(a) (emphases added).

## III.

[16] Our holding that the criminal restitution enforcement provision allows for the garnishment of retirement benefits covered by ERISA does not, however, resolve this case. A key question remains: When is a participant's interest in a retirement plan "property or [a] right[ ] to property" under 18 U.S.C. § 3613(a)? Only if the defendant's interest is properly so categorized can that interest be reached by the government when enforcing a restitution order under MVRA.

The government here seeks to require The May Department Stores Company immediately to cash out at least a portion of the retirement accounts it holds on Novak's behalf:[17] The gov-

[17]It is not entirely clear whether the government believes it has the authority to reach only Novak's holdings in the May Profit Sharing Plan,

ernment has stated its "inten[t] to get the money now so that it's available to the victim of the defendant's offense," instead of waiting "until the defendant is entitled to retire, entitled to receive retirement benefits, or makes application for them." We therefore proceed to clarify the extent to which garnishment pursuant to MVRA can require retirement plans immediately to turn over the entire present value of a participant's interest.[18]

The matter is far from straightforward, as retirement plans differ widely in their terms. Plans often include promises of future benefits not convertible to cash in whole or part until some contingency — such as reaching a certain age or becoming disabled — occurs. Determining whether such a contingent interest has become "property or [a] right[ ] to property" within the meaning of § 3613(a) is a necessary prerequisite to enforcement of a restitution order under MVRA.

Even though state law ordinarily informs the delineation of "property,"[19] the interpretation of the term "property or [a]

_____

or both those holdings and also Novak's interest in the May Retirement Plan. Although the record is not plain, the latter plan appears to entitle Novak to receive an annuity upon attaining age sixty-five. Before the district court, the government only made reference to the $142,245.11 in the May Profit Sharing Plan. At oral argument on appeal, government counsel somewhat inconsistently asserted that the government was not seeking to receive more than what the defendant-participant is entitled to presently under the terms of his retirement plan, but also that the government's right to garnish was not restricted to plans under which a cash-out is immediately available at the time of garnishment.

[18]It is possible for a garnishment order to require that a person owing money to a judgment debtor turn over proceeds as they become due. *Cf.* 28 U.S.C. § 3205(a), (c)(9) (specifying that a writ of garnishment under FDCPA is "continuing" and that the government must provide an accounting to a judgment debtor at least once each year while the writ is in effect). The government, however, does not view its garnishment order as limited to receiving any periodic payments Novak is owed in the future, once he retires.

[19]For instance, state law is usually determinative of what "property" is subject to tax levy. *See Drye v. United States*, 528 U.S. 49, 58 (1999)

right[ ] to property" in the current context must be determined by taking into account federal law. Retirement plans covered by ERISA, the species of property rights that here concerns us, are governed exclusively by federal law. *See* 29 U.S.C. § 1144(a) (dictating that, with certain exceptions, ERISA "shall supersede any and all State laws insofar as they . . . relate to any employee benefit plan"). We therefore look to ERISA to determine the extent and nature of the rights a retirement plan participant holds in the plan.

### A.

Instructively, the Supreme Court has directly addressed the analogous issue in the tax levy context: "In a levy proceeding, the IRS steps into the taxpayer's shoes. The IRS acquires whatever rights the taxpayer himself possesses." *Nat'l Bank of Commerce*, 472 U.S. at 725 (quoting *United States v. Rodgers*, 461 U.S. 677, 691 n.16 (1983)) (internal quotation marks and citations omitted).

The question, then, is how far the interest of a criminal defendant who is a participant in an ERISA-covered retirement plan extends. The answer varies with the type of plan at issue. ERISA provides an employee a nonforfeitable right to the "accrued benefit derived from his own contributions" and to the "accrued benefit derived from employer contribution" once he or she has completed a statutorily prescribed minimum years of service, thereby "vesting." 29 U.S.C. § 1053(a)(1)-(2). For defined benefit plans, the traditional type of retirement plan in which participants are promised "an annual benefit commencing at normal retirement age," the accrued benefit is a right to the annual payments promised by

---

("We look initially to state law to determine what rights the taxpayer has in the property the Government seeks to reach, then to federal law to determine whether the taxpayer's state-delineated rights qualify as 'property' or 'rights to property' within the compass of the federal tax lien legislation.").

the terms of the plan or, if the plan provides the option of receiving a lump sum payment in lieu of those annual payments, to their actuarial equivalent. *Id.* §§ 1002(23)(A), 1054(c)(3). For defined contribution plans, in which benefits are "based solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses" on those contributions, *id.* § 1002(34), the accrued benefit is "the balance of the individual's account," *id.* § 1002(23)(B).

Under ERISA, a retirement plan participant need not have the right to receive his accrued benefits as an immediate cash payment at any time. Instead, ERISA only guarantees participants a right to begin receiving payments sixty days after the close of the year in which they turn sixty-five, complete ten years of service with the company, or leave the company, whichever occurs latest.[20] *Id.* § 1056(a). Even after that point, ERISA only guarantees the right to receive payments at the rate specified in the plan. *See id.* § 1002(19) (defining "nonforfeitable" in terms of the benefit owed "under a pension plan"); *Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504, 511 (1981) ("[W]hat defines the content of the benefit that, once vested, cannot be forfeited? ERISA leaves this question largely to the private parties creating the plan."). A plan may provide for payment of accrued benefits in one lump sum, although only with the participant's consent when the total payment exceeds five thousand dollars. 29 U.S.C. § 1053(e). For plans required to provide an annuity to the employee's surviving spouse,[21] the spouse also must consent to lump sum payments that exceed five thousand dollars. *Id.* § 1055(g).

[20] ERISA does not forbid retirement plans from making payments to participants before that point. Under certain circumstances, however, participants who receive payments before they attain age 59 must pay a tenpercent penalty tax. 26 U.S.C. § 72(t).

[21] ERISA requires that most retirement plans provide such spousal annuities. There is an exception for certain defined contribution plans that, upon the death of the participant, pay all remaining accrued benefits to survivors. 29 U.S.C. § 1055(b)(1).

**[17]** A participant's right to receive cash from his retirement plan at any given time is thus limited to the right to receive the amount then available under the terms of the plan. Because that is so, under the "steps into the taxpayer's shoes" principle, *see Nat'l Bank of Commerce*, 472 U.S. at 725, a tax levy can demand (1) that a retirement plan directly pay to the IRS any post-retirement payments that otherwise would have automatically gone to the taxpayer; and (2) *if* the plan allows the participant to demand payment before retirement or at a different rate — including immediate payment of the entire present value of benefits — the full amount that the participant could presently demand.[22]

This dual understanding accords with judicial and administrative interpretations of the tax levy power. On the one hand, we have noted that "the IRS cannot . . . enforce its liens on [a taxpayer's] interest in his ERISA plan until the plan enters pay-out status," if the taxpayer "has no right to demand payment from the plan trustee until that time" under the plan's terms. *U.S. IRS v. Snyder*, 343 F.3d 1171, 1175 (9th Cir. 2003). On the other hand, although we have not addressed the question, other circuits have held that the IRS has the authority to demand annuity and retirement funds when the beneficiary has the contractual right immediately to withdraw the money sought. *See Kane v. Capital Guardian Trust Co.*, 145 F.3d 1218, 1223 (10th Cir. 1998) ("[Taxpayer's] right to liquidate his IRA and withdraw the funds therefrom (even if subject to some interest penalty) undoubtedly constituted a 'right to property' subject to the IRS' administrative levy power under 26 U.S.C. § 6331(a). Upon [the plan's] receipt of the notice of levy, the IRS stepped into [the taxpayer's] shoes and acquired *all* his rights in the IRA, including his right to liquidate the mutual fund shares in his IRA and withdraw the cash proceeds."); *United States v. Metro. Life Ins.*, 874 F.2d 1497, 1500 (11th Cir. 1989) (holding that the IRS had the immedi-

---

[22]Retirement plan distributions to satisfy a tax levy are not subject to the ten-percent penalty tax. 26 U.S.C. § 72(t)(2)(A)(vii).

ate right to levy the full value of an annuity when the taxpayer "had the right to withdraw the full value of the annuity").[23]

The IRS makes a similar distinction in the publications that explain its levy powers. *See* Rev. Rul. 55-210, 1955-1 C.B. 544 ("[I]t is the position of the Internal Revenue Service that where a taxpayer has an unqualified fixed right, under a trust or a contract, . . . to receive periodic payments or distributions of property . . . a notice of levy . . . is effective to reach, in addition to payments or distributions then due, any subsequent payments or distributions that will become due thereunder, at the time such payments or distributions become due."); IRS, INTERNAL REVENUE MANUAL § 5.11.6.2 (Mar. 15, 2005) ("The taxpayer may be able to withdraw money in a lump sum from a [retirement] plan. If the taxpayer has the right to do so, a levy can reach that right. However, remember that a levy only reaches the taxpayer's present rights.").

## B.

[18] As with our earlier analysis of the effect of ERISA's anti-alienation provision, we follow the tax levy analysis in determining the scope of the property subject to enforcement under the nearly identically worded restitution enforcement provision. Applying that analogy, we hold the government can immediately garnish the corpus of a retirement plan to satisfy a MVRA judgment — rather than merely obtain post-retirement payments that otherwise would have gone to the defendant — if, but only if, the terms of the plan allow the defendant to demand a lump sum payment at the present time.

Our reliance on the tax levy analogy accords with the IRS's view on this precise question. In advising retirement plans

---

[23]In light of these judicial rulings interpreting the term "right to property" in the tax levy context, the dissent's accusation that we are exceeding our judicial authority by similarly construing the same undefined language as contained in MVRA is hard to fathom. *See* Dissent at 2012-13.

that they do not violate the tax laws by responding to garnishment demands pursuant to MVRA,[24] IRS Priv. Ltr. Rul. 200426027, at 11 (June 25, 2004), 2004 PLR LEXIS 315, at *20-21, the IRS noted that "the government is subject to the same constraints when enforcing its garnishment order that the Service is subject to when collecting a tax. The government steps into the shoes of the taxpayer . . . ." *Id.* at 12, 2004 PLR LEXIS 315, at *23.[25] "Though letter rulings are not binding, we think the Commissioner's position makes eminent sense." *Jombo v. Comm'r*, 398 F.3d 661, 665 (D.C. Cir. 2005) (citation omitted).

We note that because the government's right is to step into the *defendant's* shoes, it will not be able unilaterally to cash out a retirement plan when ERISA requires that lump sum payments be made payable only with spousal consent. *See* I.R.S. Priv. Ltr. Rul. 200426027, at 12, 2004 PLR LEXIS 315, at *23-24. This limitation accords with the congressional intent, highlighted in *Guidry*, to protect "blameless" dependents. 493 U.S. at 376; *see also* 18 U.S.C. § 3664(f)(2)(C) (requiring MVRA restitution orders to account for financial obligations to dependents). Conversely, to the extent that ERISA does not require certain retirement plans to provide survivor annuities, *see* 29 U.S.C. § 1055(b)(1)(C) (detailing

---

[24]The Internal Revenue Code contains an anti-alienation provision, identically worded to section 206(d) of ERISA, which retirement plans must follow to receive favorable tax treatment. 26 U.S.C. § 401(a)(13)(A). Although this case does not call on us to determine the tax treatment of MVRA garnishment orders, the identical language of the two provisions supports the IRS's advice that pension plans can maintain favorable tax treatment after complying with such orders notwithstanding the dissent's parsing of the tax code, Dissent at 2019.

[25]Pursuant to the Tax Court's ruling that the ten-percent penalty tax is not owed when a defendant forfeits his retirement plan as part of the terms of a criminal plea, *Murillo v. Comm'r*, 75 T.C.M. (CCH) 1564 (1998), *acq. in result*, 1999-1 C.B., at xix, it does not appear that the tax applies to retirement plan proceeds garnished to satisfy MVRA restitution orders either. *See* IRS Priv. Ltr. Rul. 200426027, at 12-13, 2004 PLR LEXIS 315, at *24-25.

conditions under which defined contribution plans do not need to provide survivor annuities), the government does not need to receive spousal consent to cash out these plans (unless the plan itself provides otherwise). In other words, there are some circumstances in which the government under MVRA can reach plan assets without obtaining spousal consent, but that is because Congress has chosen in those instances not to protect spouses against a participant's decision to squander any lump sum due. *See id.* § 1055(g).

## C.

As it turns out, ascertaining the applicable legal principles is not sufficient to allow us, on the record before us, to determine the extent of Novak's property rights in The May Department Stores Company's retirement plans.

The burden is on Novak, as the party seeking to quash the writ of garnishment, to prove its invalidity. 28 U.S.C. § 3205(c)(5). The record does not contain the terms of May's retirement plans; only a cursory statement from the company about Novak's current right to receive plan benefits upon the completion of the necessary paperwork. That statement does not suffice to allow us to ascertain whether Novak is entitled under the plans to exercise the immediate payment option unilaterally.

**[19]** Until today, however, we have not specified the need to identify with precision the rights to payment provided under a retirement plan when determining the scope of the government's garnishment rights under MVRA. Fairness therefore dictates that we remand to the district court so that the parties can introduce the pertinent terms of the retirement plans into the record. *See Playboy Enters., Inc. v. Netscape Commc'ns Corp.*, 354 F.3d 1020, 1033 (9th Cir. 2004) (remanding and allowing the parties to introduce new evidence when the relevant legal standard was clarified only after the district court's decision). Once Novak's retirement

benefit rights are clear, the district court will be in a position to determine the extent of the government's right to garnish, consistent with our foregoing analysis.

VACATED and REMANDED. The parties shall bear their own costs on appeal.

**Volume 2 of 2**

W. FLETCHER, Circuit Judge, with whom Judges PREGER-SON, REINHARDT, THOMAS, and RAWLINSON join, dissenting:

The question in this case is whether the Mandatory Victim Restitution Act (MVRA), codified in relevant part at 18 U.S.C. § 3613, abrogates ERISA's strict prohibition on alienation of pension benefits. The majority holds that it does. For two reasons, the majority is mistaken.

First, the majority fails to recognize that our task in this case is limited. We are not called upon to clear up ambiguities of the MVRA. Rather, we are asked to decide whether that Act evinces an *unmistakable* intention to override ERISA's anti-alienation provision. As the Supreme Court explained in *Guidry v. Sheet Metal Workers National Pension Fund*, 493 U.S. 365 (1990), ERISA's anti-alienation provision "reflects a considered congressional policy choice," and only a clear and specific legislative directive is sufficient to defeat it. *Id.* at 376. Moreover, it is settled law, wholly apart from *Guidry*, that Congress cannot repeal a prior law by implication unless it expresses a "clear and manifest" intention to do so. *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 154 (1976); *see also Moyle v. Dir., OWCP*, 147 F.3d 1116, 1119-21 (9th Cir. 1998) (using the doctrine of implied repeals to determine when a statute that purports to apply "notwithstanding" any other law actually displaces a pre-existing statute).

Second, once our role is properly understood, it is apparent that the MVRA is not sufficiently clear. The relevant text of the MVRA is a relatively short "notwithstanding any other federal law" clause. The clause does not mention ERISA. Nor does the clause amend the Internal Revenue Code.

The legislative history clearly indicates that Congress did not intend to abrogate ERISA's anti-alienation provision when it adopted the MVRA. In 1996, prior to the passage of the MVRA, Senator McCain proposed a bill that would have

done what the majority contends the MVRA has done through its "notwithstanding" clause. Unlike the MVRA, Senator McCain's bill expressly amended ERISA's anti-alienation clause to allow attachment of ERISA-covered pension benefits. His bill also expressly amended the Internal Revenue Code to allow the preservation of tax-exempt status of ERISA plans for all plan participants despite the newly introduced possibility of alienation. Senator McCain's bill required 128 lines of text to accomplish these tasks. Senator McCain's bill was never made part of the Senate version of what became the MVRA. The "notwithstanding" clause of the MVRA was introduced without discussion during Conference Committee deliberations. No reference was made to the McCain bill, or to ERISA, in the Conference Report.

In 1997, after the passage of the MVRA, Congress expressly amended ERISA to permit restitution orders to reach ERISA-covered pension benefits for crimes committed against the plan itself. Again, unlike the MVRA's "notwithstanding" clause (and *like* the unsuccessful McCain bill), the 1997 amendment expressly amended ERISA's anti-alienation clause, and expressly amended the Internal Revenue Code to allow the preservation of ERISA plans' tax-exempt status. The 1997 amendment required 161 lines of text to accomplish this. The obvious reason for the 1997 amendment was that Congress believed that these ERISA-covered pension benefits could not otherwise be reached to satisfy restitution orders, even after the passage of the MVRA. The Senate Report accompanying the 1997 amendment clearly expressed this belief. It stated that "[t]here is no specific exception under the Employment Retirement Income Security Act of 1974 . . . which would permit the offset of a participant's [ERISA pension] benefit against the [restitutionary] amount owed."

The unsuccessful McCain bill and the successful 1997 amendment show us that when congressional drafters intended to amend ERISA's anti-alienation clause, they knew how to do it. In both cases, the drafters expressly amended

ERISA's anti-alienation clause, and expressly amended the Internal Revenue Code to allow the preservation of tax-exempt status. The drafters of the MVRA's short "notwithstanding" clause did neither of these things, as they surely would have done had they intended to amend ERISA. The successful 1997 amendment shows us something more. It shows us that in 1997, after the passage of the MVRA, Congress itself did not believe that the MVRA's "notwithstanding" clause had abrogated ERISA's anti-alienation provision.

I

ERISA states unequivocally that ERISA-covered pension benefits "may not be assigned or alienated." 29 U.S.C. § 1056(d)(1). This anti-alienation provision protects pension funds from diminution prior to retirement by preventing transfers to third parties. It implements "a [legislative] decision to safeguard a stream of income for pensioners (and their dependents who may be, and perhaps usually are, blameless), even if that decision prevents others from securing relief for the wrongs done them." *Guidry*, 493 U.S. at 376.

According to the Supreme Court, neither ambiguous statutory language nor equitable considerations are sufficient to override § 1056(d)(1). Instead, the onus is on Congress to legislate clearly and precisely when it wishes to create exceptions to the anti-alienation provision. The Court in *Guidry* provided an example of what it had in mind: In section 104(a) of the Retirement Equity Act of 1984, 29 U.S.C. § 1056(d)(3), Congress explicitly amended ERISA to exempt "qualified domestic relations orders" from ERISA's anti-alienation provision. *Guidry*, 493 U.S. at 376 n.18. Because of the complexity of the issues involved in such an amendment, section 104(a) occupies six full pages of the U.S. Code Annotated. In other words, when the Supreme Court sought to show how Congress should express its intention to override the anti-alienation provision, it cited a directive that explicitly, care-

fully, and unambiguously permitted alienation of ERISA-covered pension benefits.

By contrast, the Court held in *Guidry* that the Labor-Management Reporting and Disclosure Act of 1959 (LMRDA) did not abrogate ERISA's anti-alienation provision. The LMRDA authorized union members to sue union officials "to recover damages or secure an accounting *or other appropriate relief* for the benefit of the labor organization." 29 U.S.C. § 501(b) (emphasis added). The Court recognized that allowing labor organizations to seize pension benefits would facilitate recovery under the LMRDA. It also recognized that ERISA includes a savings clause, which provides that the Act shall not "be construed to alter, amend, modify, invalidate, impair, or supersede any law of the United States." 29 U.S.C. § 1144(d). ERISA was, of course, adopted long after the LMRDA.

Nevertheless, the Court concluded that the LMRDA did not supersede ERISA's anti-alienation provision:

> It is an elementary tenet of statutory construction that "[w]here there is *no clear intention otherwise*, a specific statute will not be controlled or nullified by a general one . . . ." We do not believe that congressional intent would be effectuated by reading the LMRDA's general reference to "other appropriate relief" as overriding *an express, specific congressional directive* that pension benefits not be subject to assignment or alienation.

*Guidry*, 493 U.S. at 375-76 (alterations in original, emphases added) (quoting *Morton v. Mancari*, 417 U.S. 535, 550-51 (1974)).

Subsequent cases confirm that *Guidry* requires an unambiguous legislative command to create an exception to ERISA's

anti-alienation provision. In *Boggs v. Boggs*, 520 U.S. 833 (1997), the Court wrote,

> ERISA's pension plan anti-alienation provision is mandatory and contains only two explicit exceptions, *see* §§ 1056(d)(2), (d)(3)(A), which are not subject to judicial expansion. The anti-alienation provision can "be seen to bespeak a pension law protective policy of special intensity: Retirement funds shall remain inviolate until retirement."

*Id.* at 851 (citation omitted) (quoting John H. Langbein & Bruce A. Wolk, *Pension and Employee Benefit Law* 547 (2d ed. 1995)). The Court continued, "The axis around which ERISA's protections revolve is the concepts of participant and beneficiary. When Congress has chosen to depart from this framework, it has done so in a careful and limited manner." *Id.* at 854; *see also Patterson v. Shumate*, 504 U.S. 753, 760 (1992) (noting that the Supreme Court "vigorously has enforced ERISA's prohibition on the assignment or alienation of pension benefits, declining to recognize any implied exceptions to the broad statutory bar").

The majority discounts these precedents by claiming that they focus on equitable rather than statutory exceptions to § 1056(d)(1). Majority at 1979. That is incorrect. These cases stand for the general proposition that courts should protect ERISA-covered pension funds by refusing to recognize exceptions to ERISA's anti-alienation provision unless they are certain Congress intended to create them. The threat to ERISA-covered pension benefits—and to the innocent dependents who rely on those benefits—is the same whether a court construes an ambiguous statute to allow alienation or whether it creates an equitable exception out of whole cloth. As we have explained, under *Guidry*, "*any* exceptions to the anti-alienation provision must be *expressly mandated* by Congress." *Ablamis v. Roper*, 937 F.2d 1450, 1454 (9th Cir. 1991) (emphasis added).

In *Ablamis*, we considered whether the exception for qualified domestic relations orders (QDROs), 29 U.S.C. § 1056(d)(3)(B), included probate orders. Petitioner argued that reading "domestic relations" to cover probate matters was both textually permissible and consistent with legislative intent, but we held that we were required to construe the QDRO exception narrowly:

> We are bound by the specific use of the term "domestic relations" and the notable failure to include the term "probate" in section 1056(d). If Congress had intended to create an exception to the prohibition on alienation that would permit a deceased spouse to bequeath her purported interests in a surviving employee's pension benefits to a third party, it would undoubtedly have expressly excepted probate orders in addition to domestic relations orders. . . . That is a choice we are bound to respect.

*Ablamis*, 937 F.2d at 1456; *cf. John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank*, 510 U.S. 86, 97 (1993) (noting that courts should be "inclined, generally, to tight reading of exemptions from comprehensive schemes" such as ERISA).

The majority is also wrong to suggest that the "specific-versus-general" canon of statutory construction invoked in *Guidry* is not relevant here. In *Guidry*, the Court held that the fact that the LMRDA created a "general" entitlement to "appropriate relief" did not allow the garnishment of ERISA-covered pension benefits, even if such relief would otherwise have been appropriate. *Guidry*, 493 U.S. at 375-76. In this case, the fact that the MVRA creates a general entitlement to restitution is not sufficient, standing alone, to override a statutory provision that specifically prohibits the alienation of ERISA-covered pension benefits.

Because the majority gives short shrift to *Guidry* and its progeny, it misapprehends our interpretive task. We must

determine whether Congress expressed a clear intention to override ERISA's anti-alienation provision when it adopted the MVRA. With that task in mind, I turn to the text of the provisions at issue here.

II

As its name implies, the principal objective of the Mandatory Victim Restitution Act was to ensure that restitution would be mandatory, rather than discretionary, in some criminal cases. In order to find the MVRA's supposedly clear exception to ERISA's anti-alienation provision, the majority travels a long and circuitous path. The journey begins with 18 U.S.C. § 3663A, which provides that courts "shall order" that a defendant convicted of certain enumerated offenses make restitution. 18 U.S.C. § 3663A(a)(1). Section 3663A requires courts to "issue[ ] and enforce[ ]" restitution orders "in accordance with section 3664." *Id.* § 3663A(d). Section 3664, in turn, provides that "[a]n order of restitution may be enforced by the United States in the manner provided for in subchapter C of chapter 227 and subchapter B of chapter 229." *Id.* § 3664(m)(1)(A)(i). Subchapter B of chapter 229, in turn, includes 18 U.S.C. § 3613, which contains a "notwithstanding" clause. According to the majority, this clause clearly states that restitution orders can reach undistributed ERISA-covered pension benefits.

Unfortunately for the majority, neither § 3613, nor indeed any other provision of the MVRA, makes any reference whatsoever to ERISA. Section 3613 provides, in relevant part:

> The United States may enforce a judgment imposing a fine in accordance with the practices and procedures for the enforcement of a civil judgment under Federal law or State law. *Notwithstanding any other Federal law* (including section 207 of the Social Security Act), a judgment imposing a fine

> may be enforced against all property or rights to property of the person fined, except that—
>
> (1) property exempt from levy for taxes pursuant to section 6334(a)(1), (2), (3), (4), (5), (6), (7), (8), (10), and (12) of the Internal Revenue Code of 1986 shall be exempt from enforcement of the judgment under Federal law;
>
> . . . .

18 U.S.C. § 3613(a) (emphasis added). Despite the majority's assertions to the contrary, this general "notwithstanding" language fails to demonstrate a clear intention to abrogate ERISA's anti-alienation provision. *See, e.g.*, *Morton*, 417 U.S. at 550-51 ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment.").

The majority concedes, as it must, that we do not give conclusive weight to "notwithstanding" clauses. Congress often uses such clauses as a shorthand way of ensuring that unspecified prior laws do not subvert a new enactment in unanticipated ways. However, holding that " 'notwithstanding' language preempts all [laws] that 'obstruct the subsequent statute's objectives' . . . goes too far." *Nw. Forest Res. Council v. Pilchuck Audubon Soc'y*, 97 F.3d 1161, 1166 (9th Cir. 1996). Instead, "[w]e have repeatedly held that the phrase 'notwithstanding any other law' is not always construed literally." *Or. Natural Res. Council v. Thomas*, 92 F.3d 792, 796 (9th Cir. 1996) (citing *E.P. Paup Co. v. Dir., OWCP*, 999 F.2d 1341, 1348 (9th Cir. 1993); *see also Kee Leasing Co. v. McGahan* (*In re Glacier Bay*), 944 F.2d 577, 582 (9th Cir. 1991); *Golden Nugget, Inc. v. Am. Stock Exch., Inc.*, 828 F.2d 586, 588-89 (9th Cir. 1987) (per curiam)). The presence of "notwithstanding" language, though relevant, is only one of many factors that courts must consider when determining the proper relationship between two particular legislative enact-

ments. Recognizing this, the majority asserts that the "overall context" of the MVRA reveals an intent to abrogate ERISA's anti-alienation provision. Majority at 1965. The problem is that the majority, wholly apart from its failure to follow *Guidry*, ignores our usual approach for deciding when a "notwithstanding" clause overrides pre-existing statutory language.

As we have previously held, we determine the effect of "notwithstanding" language according to the doctrine of implied repeals. That is because "notwithstanding" clauses do not "specifically refer[ ]" to the statutes they supposedly supersede. *Moyle v. Dir., OWCP*, 147 F.3d 1116, 1119 n.4 (9th Cir. 1998); *see also* Norman J. Singer, 1A *Sutherland Statutory Construction* § 23:8 (6th ed. 2000) ("A general repealing clause cannot be deemed an express repeal because it fails to identify or designate any act to be repealed."). It is well known that "repeals by implication are not favored." *Branch v. Smith*, 538 U.S. 254, 273 (2003) (plurality opinion) (citations and internal quotation marks omitted); *see also United States v. United Cont'l Tuna Corp.*, 425 U.S. 164, 168 (1976) ("It is, of course, a cardinal principle of statutory construction that repeals by implication are not favored."). "An implied repeal will only be found [1] where provisions in two statutes are in 'irreconcilable conflict,' or [2] where the latter Act covers the whole subject of the earlier one and 'is clearly intended as a substitute.' " *Branch*, 538 U.S. at 273 (citations omitted). " '[I]n either case, the intention of the legislature to repeal must be *clear and manifest*.' " *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 154 (1976) (quoting *Posadas v. Nat'l City Bank*, 296 U.S. 497, 503 (1936)) (emphasis added).

Because the MVRA does not cover the "whole subject" of pension benefit alienation, the only question here is whether there is an "irreconcilable conflict" between the MVRA and ERISA's anti-alienation provision. There is no such conflict. ERISA's anti-alienation provision is simply a "minor exception" to the MVRA's general restitution requirement. Even if undistributed ERISA-covered pension funds are not subject to

garnishment under the MVRA, the government may still enforce restitution orders on behalf of crime victims. *See Lujan-Armendariz v. INS*, 222 F.3d 728, 744 (9th Cir. 2000) (noting that "[b]oth this court and the Supreme Court have found no irreconcilable conflict where, by creating minor exceptions to later enacted statutes based on earlier ones, both statutes can be preserved"). Offenders who have undistributed funds in an ERISA-covered pension plan will often have other assets. Even if they do not, the government is free to enforce restitution orders once the ERISA benefits have been distributed to the offender. *See Wright v. Riveland*, 219 F.3d 905, 919-21 (9th Cir. 2000). The government could, of course, secure restitution payments more rapidly if ERISA's anti-alienation provision were set aside, but it is up to Congress to decide whether the tradeoff between faster restitution and diminished pension security is worth making. If that is Congress's intent, *Guidry* tells us that it must be clearly expressed.

## III

The legislative history provides two strong indications that Congress did not intend to subject undistributed ERISA-covered pension funds to MVRA restitution orders. First, Congress chose not to incorporate into the MVRA express language from a bill proposed by Senator McCain that would have unmistakably overridden ERISA's anti-alienation provision. Second, one year after the passage of the MVRA, Congress passed legislation specifically providing that restitution orders can reach ERISA-covered pension funds when a defendant's crime involves that pension plan. I discuss these indicia of legislative intent in turn.

## A

On December 22, 1995, the Senate debated the bill that would eventually become the MVRA. Senator McCain lamented that "the bill does not include all of the provisions

I would like to see." 141 Cong. Rec. S19273, S19281 (daily ed. Dec. 22, 1995). He elaborated:

> I had intended to offer an amendment to the Employee Retirement Income Security Act [ERISA] which would allow pension income to be garnished to pay outstanding restitution or criminal debt orders. Under current law, retirement benefits can only be attached to pay delinquent child support. The collection of victim compensation and criminal debt should be priorities as well.

*Id*. at S19282. Senator McCain "decided to withhold" his amendment based on "assurances from the committee that the initiative[ ] . . . will be considered next year." *Id*. Senator Hatch confirmed that "[t]he committee intends to take up an enforcement bill next year." *Id*. The bill then passed the Senate, without Senator McCain's amendment, by voice vote. *Id*.

Two months later, on February 20, 1996, Senator McCain introduced S. 1570, "[a] bill to amend the Employee Retirement Income Security Act of 1974 . . . to provide that the restriction on the assignment or alienation of pension plan benefits shall not apply to court-ordered criminal fines or victim restitution." 142 Cong. Rec. S1276 (daily ed. Feb. 20, 1996). McCain's bill would have amended ERISA itself. It would have added a paragraph to ERISA's anti-alienation provision, 29 U.S.C. § 1056(d), providing that the rule "shall not apply to a qualified criminal restitution order and each pension plan shall provide for payments in accordance with the applicable requirements of a qualified criminal restitution order." S. 1570, 104th Cong. § 1(a)(1) (1996). The bill included a detailed definition of a "qualified criminal restitution order." *Id*. It also expressly amended the Internal Revenue Code to permit pension plans to alienate funds pursuant to qualified criminal restitution orders without losing their tax-favored status. *Id*. § 1(b).

Senator McCain offered the following explanation of why he believed his bill was necessary:

> Mr. President, today I am introducing legislation that would provide crime victims a real opportunity to receive their due restitution from convicted criminals. This bill would enhance collections on criminal restitution orders for crime victims by allowing the Federal Government to garnish the pension plan benefits of convicted felons.
>
> *Currently, courts may not garnish pension benefits provided under the Employee Retirement Income Security Act [ERISA] to satisfy criminal restitution orders.* As a result, criminals can avoid paying fines or making restitution to their victims when their only income consists of pension money. In fact, in most cases, criminals have pension money as their only source of income, and therefore, they never pay off their debt.

*Id*. (emphasis added). The Senate did not adopt Senator McCain's bill. Nor did it incorporate any of the bill's language into the final version of the MVRA, which passed in April 1996 following reconciliation by a House-Senate Conference Committee. *See* Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214.

The majority attempts to blunt the impact of this adverse legislative history by noting that the final bill differed somewhat from the version passed by the Senate in December 1995. Most notably, the "notwithstanding" clause appeared in the legislation for the first time when it emerged from the Conference Committee in April 1996. The majority surmises that the Conference Committee might have added the "notwithstanding" language in order to address Senator McCain's concerns. But that is very unlikely.

First, the Conference Report offers no suggestion that the conferees intended to alter the substance of the bill in order to override ERISA's anti-alienation provision. The Report simply states:

> Senate recedes to [the House version], with modification. The modification includes the Senate amendments to the bill H.R. 665, passed by the Senate on December 22, 1995, together with perfecting amendments. The managers intend that the Report of the Senate Committee on the Judiciary to accompany H.R. 665 (S. Rept. 104-179) should serve as the legislative history for this subtitle.

H.R. Rep. No. 104-518, at 111-12 (1996) (Conf. Rep.). Neither the Conference Report nor the Senate Report says anything whatsoever about ERISA-covered pension benefits. *See* S. Rep. No. 104-179 (1995).

Second, it is difficult to believe that the Conference Committee would have attempted to abrogate ERISA's anti-alienation provision in such an offhand and summary manner. We must assume that the Committee was aware that, under both *Guidry* and the doctrine of implied repeals, it had to express its intention clearly if it intended to override ERISA's anti-alienation provision. *See Lorillard v. Pons*, 434 U.S. 575, 580 (1978). Had the Committee wanted to amend ERISA, it easily could have included the clear, direct, and detailed language of Senator McCain's bill instead of a short and cryptic "notwithstanding" clause. At the very least, the Committee could have explained the function of the "notwithstanding" clause in the Conference Report. Because it did neither of these things, I am unable to read the "nothwithstanding" language to mean the same thing as the McCain bill. As the Supreme Court has observed, " 'Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other lan-

guage.' " *INS v. Cardoza-Fonseca*, 480 U.S. 421, 442-43 (1987) (quoting *Nachman Corp. v. Pension Benefit Guar. Corp.*, 446 U.S. 359, 392-93 (1980)); *see also Hamdan v. Rumsfeld*, 126 S. Ct. 2749, 2754 (2006) ("Congress' rejection of the very language that would have achieved the result the Government urges weighs heavily against the Government's interpretation.").

B

Legislation passed after the MVRA confirms that the "notwithstanding" clause did not authorize the garnishment of undistributed ERISA-covered pension benefits. In 1997, a year after the MVRA's enactment, Congress expressly amended ERISA's anti-alienation provision to allow a narrow subset of restitution orders to reach ERISA-covered pension benefits. The 1997 amendment expressly authorized restitution when the crime involved the pension plan itself. *See* 29 U.S.C. § 1056(d)(4) (providing that ERISA's anti-alienation provision "shall not apply to any offset of a participant's benefits provided under an employee pension benefit plan against an amount that the participant is ordered or required to pay to the plan if . . . the order or requirement to pay arises . . . under a judgment of conviction for a crime involving such plan"). Further, the 1997 amendment expressly amended the Internal Revenue Code to ensure that alienation under these circumstances would not have unfavorable tax consequences for pension plans. Had the MVRA generally abrogated ERISA's anti-alienation provision the year before, this amendment almost certainly would not have taken the form that it did.

The 1997 amendment was included in the Taxpayer Relief Act of 1997, Pub. L. No. 105-34, § 1502, 111 Stat. 788, 1058-59. The Senate Report plainly indicates that Congress did not understand the MVRA to have already created an exception to ERISA's anti-alienation provision:

Under present law, amounts to be held in a quali-fied retirement plan for the benefit of a participant

are not, except in very limited circumstances, assignable or available to personal creditors of the participant. . . .

*There is no specific exception under the Employee Retirement Income Security Act of 1974 . . . which would permit the offset of a participant's benefit against the amount owed to a plan by the participant as a result of a breach of fiduciary duty to the plan or criminality involving the plan. . . .*

### Reasons for Change

The Committee believes that the assignment and alienation rules should be clarified by creating *a limited exception* that permits participants' benefits under a qualified plan to be reduced under certain circumstances including the participant's breach of fiduciary duty to the plan.

### Explanation of Provision

The bill permits a participant's benefit in a qualified plan to be reduced to satisfy liabilities of the participant to the plan due to . . . the participant being convicted of committing a crime involving the plan . . . .

S. Rep. No. 105-33, at 310 (1997) (emphasis added); *see also* H.R. Rep. No. 105-220, at 756-57 (1997) (Conf. Rep.) (same).

Despite this unambiguous legislative history, the majority attempts to reconcile the 1997 amendment with the MVRA by explaining that the two provisions are different in scope. According to the majority, Congress therefore might have had reason to adopt the 1997 amendment even if the MVRA had already abrogated ERISA's anti-alienation provision. It is true

that the 1997 amendment is not limited to restitution orders issued by federal courts pursuant to criminal convictions. However, the amendment includes several important restrictions, applicable to both federal and state restitution orders, that do not appear in the MVRA. The 1997 amendment shows that when Congress wants to create an exception to ERISA's anti-alienation provision, it knows how to convey its intention in clear, direct, and detailed language, comparable to the language of the failed McCain bill.

The 1997 amendment describes in detail when and how a restitution order can reach pension benefits. The "notwithstanding" clause of the MVRA, by contrast, provides no such specification. Consequently, the majority is forced to include a lengthy discussion "to clarify the extent to which garnishment pursuant to MVRA can require retirement plans immediately to turn over the entire present value of a participant's interest." Majority at 1989. The majority's use of the word "clarify" reveals the essential weakness of its position: The majority is supplying the clarity that Congress was required to provide, but did not.

Three features of the 1997 amendment, which are entirely absent from the MVRA, illustrate this point. First, the 1997 amendment abrogates ERISA's anti-alienation provision only when "the judgment . . . expressly provides for the offset of all or part of the amount ordered or required to be paid to the plan against the participant's benefits provided under the plan." 29 U.S.C. § 1056(d)(4)(B). In other words, ERISA-covered pension benefits may not be attached unless the restitution order itself specifically authorizes such attachment. The MVRA contains no similar limitation. The restitution order in this case (as opposed to the subsequent writ of garnishment) did not mention Novak's pension benefits.

Second, the 1997 amendment does not permit garnishment without appropriate spousal consent. *Id.* § 1056(d)(4)(C). The McCain bill included similar limitations. *See* S. 1570, 104th

Cong. § 1(a)(1) (1996). The majority imposes an analogous rule by judicial construction of the MVRA, but no such limitation appears in the MVRA's text.

Third, the 1997 amendment allows attachment only of "the participant's benefits" and of "distributions from the plan to the participant." 29 U.S.C. § 1056(d)(4)(B) & (C). Similarly, the McCain bill authorized attachment of "benefits payable with respect to the participant under a plan." *See* S. 1570, 104th Cong. § 1(a)(1) (1996). By contrast, the majority construes the MVRA to allow restitution orders to reach the undistributed corpus of an individual's pension fund in at least some circumstances. Again, no such rule appears in the text of the MVRA.

For two reasons, the restrictions on attachment contained in the 1997 amendment show that Congress in 1997 could not have understood the MVRA to have abrogated ERISA's anti-alienation provision. First, the restrictions contained in the 1997 amendment and in the majority's judicial construction of the MVRA are not identical. Under the majority's reading, the MVRA remains somewhat less restrictive than the 1997 amendment. As a result, the majority creates a world in which it is more difficult to attach the ERISA-covered pension benefits of individuals who have committed crimes against pension funds than it is to garnish the ERISA-covered pension benefits of individuals who have committed other offenses. That is almost certainly contrary to Congress's intent in passing the 1997 amendment. Congress did not intend to make it harder to get restitution for crimes involving ERISA-covered pension plans. Congress intended precisely the opposite. It intended to make it easier to get restitution in such cases.

Second, by judicial construction of the MVRA, the majority has imposed restrictions on the government's ability to attach undistributed ERISA-covered pension funds. The majority has imposed these restrictions for good reason. It knows that Congress, in adopting ERISA's anti-alienation

provision, sought to provide some protection for innocent family members who may depend on an offender's pension. But the very fact that the majority has felt compelled to impose by judicial construction restrictions that are not contained in the text of the MVRA tells us that Congress did not intend that the MVRA abrogate the anti-alienation provision. In both the failed McCain bill and the successful 1997 amendment, comparable restrictions were expressly provided in the text of the legislation. That the text of the MVRA contains no such restrictions tells us that Congress was not thinking about, and did not intend to abrogate, ERISA's anti-alienation provision when it added the simple "notwithstanding" clause to the MVRA.

The majority also must contend with the fact that both the 1997 amendment and the McCain bill expressly amended (or would have amended) § 401(a)(13) of the Internal Revenue Code, but that the MVRA did not do so. Section 401(a)(13) provides that an ERISA plan cannot be "qualified"—that is, cannot be eligible for favorable tax treatment—unless it guarantees that "benefits provided under the plan may not be assigned or alienated." I.R.C. § 401(a)(13)(A); *see also* Treas. Reg. § 1.401(a)-13(b)(1) (providing that a plan "will not be qualified unless [it] provides that benefits may not be anticipated, assigned (either at law or in equity), alienated or subject to attachment, garnishment, levy, execution or other legal or equitable process"). The 1997 amendment (and the McCain bill) explicitly stated that this provision would not apply to certain restitution orders involving a pension plan. *See* I.R.C. § 401(a)(13)(C). A similar exemption exists for the domestic relations orders to which the Supreme Court pointed, in *Guidry*, as an example of a clearly expressed exception to ERISA. *See id.* § 401(a)(13)(B); *see also Guidry*, 493 U.S. at 376 n.18. By contrast, the MVRA did not amend § 401(a)(13), and nothing in the text of that section expressly authorizes plan administrators to attach benefits pursuant to a restitution order without disqualifying the plan for tax purposes.

The majority's answer is to treat restitution orders like tax levies. Although § 401(a)(13) does not expressly exempt tax levies from the anti-alienation requirement, applicable Treasury regulations do. *See* Treas. Reg. § 1.401(a)-13(b)(2). I detail the problems with the tax levy analogy below. For now, it is enough to say that the majority is once again attempting to provide clarity through judicial construction where none exists in the text of the statute. As the 1997 amendment reveals, Congress knew that abrogating ERISA's anti-alienation provision would have unwanted tax consequences unless an exception was added to § 401(a)(13). Had Congress intended to abrogate ERISA's anti-alienation provision when it enacted the MVRA, it is difficult to imagine why it would not also have amended § 401(a)(13). Congress's failure to do so is particularly striking, given that express language in the McCain bill would have done so, and that express language in the 1997 amendment in fact did do so.

Finally, the majority attempts to downplay the significance of the 1997 amendment by insisting that Congress was merely attempting to resolve a circuit split over whether ERISA's anti-alienation provision applied to offenses involving a pension plan. But that argument does nothing to bolster the majority's reading of the MVRA, for the cases cited by the majority as evidence of a circuit split were decided prior to the enactment of the MVRA. *See, e.g.*, *Coar v. Kazimir*, 990 F.2d 1413 (3d Cir. 1993) (abrogating the anti-alienation provision in cases involving an offense against a pension plan); *Herberger v. Shanbaum*, 897 F.2d 801 (5th Cir. 1990) (upholding the anti-alienation provision in such cases).

In sum, the fact that Congress adopted the 1997 amendment confirms that Congress did not intend for the MVRA's "notwithstanding" language to abrogate ERISA's anti-alienation provision. Instead, Congress faced a clear choice when it considered the 1997 amendment: Should it override ERISA's anti-alienation provision with respect to all criminal restitution orders, or should it override the anti-alienation provision

only for offenses involving pension plans? Congress chose the latter option, "creating a limited exception" for offenders who breached their fiduciary duties to a plan. S. Rep. No. 105-33, at 310 (1997).

## IV

Despite these strong indications that Congress did not intend to authorize the garnishment of ERISA-covered pension benefits when it adopted the MVRA, the majority contends that two "contextual aspects" of 18 U.S.C. § 3613 reveal that the MVRA defeats ERISA's anti-alienation provision. Majority at 1965. First, the majority argues that because ERISA-covered pension benefits do not appear in the list of property exempted from § 3613, such benefits must be subject to garnishment. Second, the majority argues that the MVRA applies to ERISA-covered pension benefits because the language of § 3613 parallels a tax levy statute that has been construed to reach such benefits. Given the contrary indications of legislative intent described above, the burden on the majority is a heavy one, and these "contextual" clues do not suffice.

## A

Section 3613 provides that "property exempt from levy for taxes pursuant to section 6334(a)(1), (2), (3), (4), (5), (6), (7), (8), (10), and (12) of the Internal Revenue Code of 1986 shall be exempt from enforcement" of a judgment imposing a fine. 18 U.S.C. § 3613(a)(1). These enumerated exemptions include certain

> [a]nnuity or pension payments under the Railroad Retirement Act, benefits under the Railroad Unemployment Insurance Act, special pension payments received by a person whose name has been entered on the Army, Navy, Air Force, and Coast Guard Medal of Honor roll (38 U.S.C. 1562), and annuities

> based on retired or retainer pay under chapter 73 of
> title 10 of the United States Code.

26 U.S.C. § 6334(a)(6). Based on the maxim *expressio unius est exclusio alterius*, the majority infers that, by explicitly exempting some property from enforcement under § 3613, Congress demonstrated its intention to reach all other property, including ERISA-covered pension benefits. However, as the Supreme Court has emphasized, *expressio unius* "is only a guide, whose fallibility can be shown by contrary indications that adopting a particular rule or statute was probably not meant to signal any exclusion of its common relatives." *United States v. Vonn*, 535 U.S. 55, 65 (2002); *see also Burns v. United States*, 501 U.S. 129, 136 (1991) ("An inference drawn from congressional silence certainly cannot be credited when it is contrary to all other textual and contextual evidence of congressional intent."). The canon has force only when we can fairly infer "that items not mentioned were excluded by deliberate choice, not inadvertence." *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003).

For two reasons, an omission from the exemptions listed in § 3613(a)(1) does not signify an affirmative decision by Congress to reach ERISA-covered pension benefits. First, when it adopted the MVRA, Congress was aware that, under both *Guidry* and the doctrine of implied repeals, a clear expression of intent was required to abrogate ERISA's anti-alienation provision. That is, Congress was aware that a failure to mention ERISA would have the effect of leaving its anti-alienation provision intact.

Second, the first point is amplified by the fact that Congress expressly provided for the inclusion of Social Security benefits as part of the "notwithstanding" clause: "Notwithstanding any other Federal law *(including section 207 of the Social Security Act)* . . . ." 18 U.S.C. § 3613(a) (emphasis added). According to the majority, Congress mentioned section 207 of the Social Security Act because that section

requires modifications to be made by "express reference." 42 U.S.C. § 407(b). The majority notes that ERISA's anti-alienation provision does not contain the same "express reference" requirement. However, *Guidry* was already on the books and served the same function as the "express reference" requirement of section 207. In fact, the Court in *Guidry* had drawn a direct parallel between ERISA's anti-alienation provision and section 207 of the Social Security Act. *See Guidry*, 493 U.S. at 372 & n.13 (noting that 29 U.S.C. § 1056(d) is "consonant with other statutory provisions designed to safeguard retirement income," including section 207). Had Congress, legislating post-*Guidry*, intended to reach ERISA-covered pension benefits, one would expect an express reference to ERISA along with its reference to the Social Security Act. But there is no such reference.

B

Section 3613 states that "an order of restitution . . . is a lien in favor of the United States on all property and rights to property . . . as if the liability . . . were a liability for a tax assessed." 18 U.S.C. § 3613(c). The majority maintains that we should read § 3613 to have the same effect as a tax lien statute that we have held reaches ERISA-covered pension benefits. *See McIntyre v. United States* (*In re McIntyre*), 222 F.3d 655 (9th Cir. 2000). However, as the majority concedes, the applicable enforcement mechanism in the present case is the Fair Debt Collection Practices Act (FDCPA) rather than an action to enforce a lien under § 3613(c). *See* Majority at 1961-62 n.6. That creates a serious problem for the majority. As discussed above, § 401(a)(13) of the Internal Revenue Code provides pension plans with favorable tax treatment only if they guarantee the inalienability of benefits. While Treasury regulations create an express exception for tax levies, there is no similar regulatory exception for criminal restitution orders.

Even if restitution were sought in this case under § 3613(c), this section provides only that tax lien *procedures* are applica-

ble to enforce restitution orders. It nowhere states that restitution orders are the functional or substantive equivalent of tax liens. Nor does it state that the property subject to a lien to satisfy a restitution order must be the same as the property subject to a lien to satisfy a tax liability. *Cf. Guidry*, 493 U.S. at 376 (holding that "the LMRDA determines what sort of *judgment* the aggrieved party may obtain, while ERISA governs the narrow question whether that judgment may be collected through a particular means—a constructive trust placed *on the pension*") (emphasis in original).

The majority nevertheless insists that it is appropriate under our earlier decision in *McIntyre* to draw a general parallel between the MVRA and tax lien provisions. I disagree. First, the tax lien provision at issue in *McIntyre* uses more precise and detailed language than the MVRA to describe the sort of property that is subject to garnishment. Under the Internal Revenue Code, a tax may be collected "by levy upon all property and rights to property (except such property as is exempt under section 6334)." 26 U.S.C. § 6331(a). Section 6334, in turn, lists thirteen types of property that are exempt from levy. *Id.* § 6334(a). It then declares that, "[n]otwithstanding any other law of the United States (including section 207 of the Social Security Act), no property or rights to property shall be exempt from levy *other than the property specifically made exempt by subsection (a)*." *Id.* § 6334(c) (emphasis added). The MVRA, by contrast, nowhere states that its list of exemptions is meant to be exclusive.

Second, the tax levy provisions were enacted as part of the Internal Revenue Code of 1954 and thus long pre-date ERISA. For this reason, the presumption against implied repeals does not come into play. Instead, the situation is reversed. The question is whether the later-enacted ERISA operates as a limitation on the pre-existing tax statute. In *McIntyre*, we explicitly recognized the force of ERISA's savings clause, which leaves pre-existing law undisturbed. The savings clause provides that nothing in ERISA "shall be con-

strued to alter, amend, modify, invalidate, impair, or super-sede any law of the United States." 29 U.S.C. § 1144(d); *see McIntyre*, 222 F.3d at 660. Thus, to the extent that the Internal Revenue Code provides for tax levies on ERISA-covered pen-sion benefits, it does so because of ERISA's savings clause.

The majority attempts to downplay this important distinc-tion between the tax code and the MVRA by insisting that ERISA's savings clause broadly applies to statutes enacted *after* ERISA. Majority at 1985. Neither the text of the savings clause nor our case law supports such a sweeping conclusion. The language used in § 1144(d)—"alter," "amend," "modify," etc.—strongly suggests that the provision focuses exclusively on ERISA's relationship to pre-existing statutes. *See, e.g.*, *Airline Pilots Ass'n v. Nw. Airlines, Inc.*, 627 F.2d 272, 276 (D.C. Cir. 1980) ("ERISA is not to be read as displacing by implication any *pre-existing* federal legislation.") (emphasis added). We would not typically say that a statute enacted in 1974 "amend[s]" a statute enacted two decades later. When Congress passed the Internal Revenue Code in 1954, it could not possibly have expressly stated an intention to abrogate ERISA's later-enacted anti-alienation provision. However, it was both possible, and necessary, for Congress expressly to state its intention to do so when it adopted the MVRA in 1996.

## Conclusion

The Supreme Court's decision in *Guidry*, coupled with the presumption against implied repeals, requires that Congress convey its intent clearly in order to override ERISA's anti-alienation provision. The majority takes 54 manuscript pages of complex argument to explain why a short and cryptic "not-withstanding" clause in the MVRA clearly abrogates this pro-vision.

I conclude that Congress did not act with the requisite level of clarity when it adopted the MVRA. The relevant statutory

text makes no reference whatsoever to ERISA, or to possible tax consequences of an abrogation of its anti-alienation provision. Further, the legislative history indicates that Congress did not intend to allow criminal restitution orders to abrogate the anti-alienation provision.

I respectfully dissent.